Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL X

| | | |
|---|---|---|
| GISELLE FLORES ÁLVAREZ<br><br>*Recurrida*<br><br>v.<br><br>DEPARTAMENTO DE LA FAMILIA<br><br>*Recurrente* | KLRA202400060 | Revisión Administrativa procedente de la Comisión Apelativa del Servicio Público<br><br>2023 CA 000596<br>Caso Núm.:<br>2017-08-0249<br><br>Sobre:<br>Retención |

Panel integrado por su presidenta, la Juez Lebrón Nieves, la Juez Barresi Ramos y la Jueza Santiago Calderón

Santiago Calderón, Jueza Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 30 de abril de 2025.

Comparece ante nos el Departamento de la Familia (DF o recurrente) a través de la Oficina del Procurador General de Puerto Rico, mediante *Recurso de Revisión Administrativa* presentado el 5 de febrero de 2024, para solicitarnos que revoquemos la *Resolución* emitida y notificada por la Comisión Apelativa del Servidor Público ("CASP", "Comisión" o "foro recurrido") el 13 de diciembre de 2023. En dicha *Resolución*, la Comisión revocó la resolución del DF, la cual ordenaba la destitución de su puesto de la Sra. Giselle Flores Álvarez (señora Flores o recurrida) y en su lugar, ordenó que se le imponga una reprimenda escrita como medida disciplinaria adecuada, según los hallazgos vertidos en la vista pública en su fondo. Asimismo, la CASP dispuso que el DF debía remover la carta de destitución del expediente de personal de la señora Flores y pagarle los salarios y beneficios marginales dejados de percibir por el tiempo que ha estado destituida de su puesto.

Por los fundamentos que exponemos a continuación, ***confirmamos*** la *Resolución* recurrida.

Número Identificador

SEN2025 _____

**I.**

Los hechos que dieron margen a la controversia ante nuestra consideración surgen cuando el DF recibe varios referidos contra la señora Anaís Vega Sepúlveda (señora Vega o madre de la menor) sobre maltrato de la menor infanta Y.M.I.V. (Y.M.I.V. o menor). El DF recibió los siguientes referidos: el 28 de noviembre de 2011, fue identificado como referido R11-11-48223 (primer referido); el 1 de diciembre de 2011, se identificó como referido R11-12-48729 (segundo referido); y el 1 de noviembre de 2012, identificado como referido R12-11-46508 (tercer referido); este último, reportó la culminación de la vida de la menor asesinada por su madre, la señora Vega.

Transcurridos siete meses del asesinato de la menor, el 7 de junio de 2013, el señor Luis G. Irizarry Natal (señor Irizarry o el padre) de la menor, presentó la querella ante la Administración de Familias y Niños (ADFAN) del DF y solicitó una investigación administrativa por negligencia institucional por las intervenciones llevadas a cabo por el personal de la Oficina Local de Ponce[1].

Para ese entonces, la recurrida ocupaba la posición de Supervisora en Trabajo Social I en la Oficina Local de Ponce II, adscrito a la ADFAN.

Incoada la querella por negligencia institucional, el 28 de octubre de 2013, se inició una investigación administrativa, la cual fue delegada a la señora Olga B. Díaz Rodríguez, supervisora de Trabajo Social I (señora Díaz o Investigadora). El 5 de diciembre de 2013, la señora Díaz rindió un informe sobre la investigación en cuanto a los primeros dos (2) referidos.

En su informe, la Investigadora detalló la metodología utilizada y las personas a quien entrevistó, que fueron solamente

---

[1]Anejo 12 de la parte recurrente, pág. 320 Informe de la Oficial Examinadora.

cuatro, a saber: al querellante, señor Irizarry, al abuelo de la menor el señor Luis Ángel Irizarry Correa, la señora Jessica De Jesús Laracuente, trabajadora social encargada de los dos primeros referidos (TS De Jesús) y la señora Flores[2].

Según el Informe de Investigación Administrativa, el lunes 28 de noviembre de 2011, llegó a la línea de maltrato, en horas laborables (1:57pm) el primer referido. Este fue realizado por un informante anónimo, quien alegó que la menor era maltratada por su madre, la señora Vega[3]. Este primer referido fue transferido después de una hora y dos minutos (1:02) a la Unidad de Investigaciones Especializadas de Ponce y estos, a su vez, asignaron el primer referido a las 2:59 pm a la Oficina Local de Ponce II. Esta transferencia fue objetada por la señora Flores[4], porque entendía que esta determinación y asignación era contraria al Manual de Seguridad de 2008. No obstante, el supervisor regional L. Sánchez, determinó que el referido fuese atendido por la Oficina Local de Ponce II. La señora Flores asignó el referido a las 4:31pm a la TS De Jesús. El 29 de noviembre de 2011, la TS De Jesús trató de contactar a las partes involucradas en el referido, sin embargo, fue un intento fallido. Al otro día, el 30 de noviembre de 2011, logró entrevistar a la madre de la menor y observó a las menores, las cuales no mostraban marcas en su cuerpo. El 7 de diciembre de 2011, contactó al padre de la menor. Este primer referido fue trabajado por la TS De Jesús hasta el 9 de diciembre de 2011 cuando se estableció como fundamento negligencia médica, por el incumplimiento de la madre de la menor con las vistas al pediatra.

Pasado un día de la intervención inicial del primer referido, el 1 de diciembre de 2011 a las 4:20 am, surgió el segundo referido a

---

[2] Anejo 17 de la parte recurrida.
[3] Los pormenores del alegado maltrato se detallan a la pág. 413 del Anejo 17 y en el Informe de la Oficial Examinadora, Anejo 12 de la recurrida.
[4] Manual de Seguridad de 2008 secc. 103.1.1.

la Unidad de Investigaciones Especializadas (UIE), en esta ocasión el informante era el Dr. Juan Méndez, licencia #17672, del Hospital Dr. Pila en Ponce y refirió lo siguiente: *"posible negligencia hacia infante de 6 meses de edad, por parte de la madre"*[5]. La menor presentaba fractura en la pierna derecha y sería referida al Centro Médico de Río Piedras. Según su criterio profesional: *"la gravedad de la fractura de la infante es de tal magnitud que no es compatible con la versión ofrecida sobre como la menor se lastimó"*.

Este segundo referido fue recibido por la TS Belitza Lugo de la UIE, quien identificó que la señora Vega contaba con antecedentes (primer referido) de maltrato asignado a la Oficina Local de Ponce II, por lo cual, ese mismo día, a las 8:40 am, procedió a informar directamente a la TS De Jesús del segundo referido. Por otra parte, el supervisor de la UIE de Ponce transfirió electrónicamente el expediente del segundo referido a la Oficina Local de Ponce II a las 9:01am[6]. La TS Belitza Lugo no notificó el referido a la señora Flores, quien era la supervisora de la TS De Jesús. No obstante, a las 3:21 pm, la señora Flores asignó el segundo referido a la TS De Jesús, cuando ya existía una investigación en curso.

El 7 de diciembre de 2011, la TS De Jesús realizó la primera intervención del segundo referido. Dialogó con dos empleadas del hospital, a saber: un facultativo médico y con la TS Torres; quienes recomendaron establecer un plan de seguridad, en el cual la madre estuviera bajo supervisión mientras le brindaban los servicios médicos a la menor[7]. Además, se identificaron como recursos de apoyo a los abuelos paternos de las menores[8].

Ante ello, como habíamos expresado, el primer referido se fundamentó bajo la tipología de negligencia médica, basado en que

---

[5] Anejo 18, pág. 414.
[6] *Íd.*
[7] *Informe investigación administrativa 5 de diciembre de 2013,* Anejo XVII de la parte recurrente.
[8] *Íd.,* pág. 433.

la señora Vega no había llevado a la menor a un pediatra desde que esta tenía un mes de nacida.

Así las cosas, el 12 de diciembre de 2011, se efectuó una reunión en la Oficina Local de Ponce II donde estuvo presente la señora Vega, los abuelos paternos de las menores, la señora Flores y la TS De Jesús. Allí, se les informó el plan de acción protectora mientras se daba el proceso de evaluación completa del segundo referido, sobre las fracturas de la menor y se completaba un plan de servicios[9]. Ello, con el propósito de preservar la unidad familiar y no tener que remover a las menores.

El Plan de Acción Protectora establecido consistió en que los padres de las menores residirían con estas en el hogar de los abuelos paternos, quienes supervisarían a la señora Vega y a las menores. Además, los padres tenían que asistir una vez a la semana a los talleres de la Escuela para la Vida en Familia del Módulo Psicoeducativo para el Fortalecimiento Familiar, y que la madre de la menor fuera referida para una evaluación psicológica a la Clínica Conductual APS de la Escuela de Medicina de Ponce. El Plan de Servicios para las menores consistió en que estas fueran llevadas a visitas de seguimiento al pediatra cada tres (3) meses y visitas por parte de la TS De Jesús al hogar donde estas estaban ubicadas. Las partes estuvieron de acuerdo con dicho plan y se firmó el documento. Cónsono a lo anterior, el 12 de diciembre de 2011, la familia de la menor fue a residir a la casa de los abuelos paternos[10].

Durante enero a mayo de 2012, la señora Vega cumplió con el plan de servicio y se le otorgó el certificado de cumplimiento de los talleres de la Escuela para la Vida en Familia del Módulo Psicoeducativo para el Fortalecimiento Familiar[11]. El 14 de junio de

---

[9] *Íd.*, pág. 436.
[10] La Sra. Flores estuvo de vacaciones del 11 de diciembre de 2011 hasta el 27 de enero de 2012 y regresó a la oficina el 30 de enero de 2012, véase, Anejo 12.
[11] No obstante, el 5 de junio de 2012, la TS De Jesús entrevistó al Sr. Luis A. Irizarry Natal, abuelo paterno de las menores, y este le informó los problemas y

2012, la señora Vega acudió a la Clínica Conductual APS y fue evaluada por la Dra. Jéssica Serrano, psicóloga. Esta concluyó que al momento no presentaba indicadores de depresión, ni condición que requiriera tratamiento psicológico o psiquiátrico en la clínica[12].

El 17 de septiembre de 2012, la TS De Jesús discutió el caso con la señora Flores y esta le indicó que procediera con el cierre del caso, ya que la señora Vega cumplió con el plan de servicios y no había indicadores de maltrato. Ese mismo día, la TS De Jesús llamó a la señora Vega para informarle sobre el cierre de su caso, ya que se cumplió con el plan de servicios[13]. El 1 de octubre de 2012, los padres de las menores junto a estas, se mudaron a su residencia.

El 1 de noviembre de 2012, el personal de Centro Médico de Río Piedras informó la situación de maltrato físico por parte de la señora Vega y negligencia por parte del padre contra su hija, la menor[14]. En igual fecha, la TS De Jesús acudió al Tribunal Municipal de Ponce a peticionar la custodia de emergencia de las menores Y.M.I.V. y B.I.V. El 2 de noviembre de 2012, personal del Centro Médico notificó a la TS De Jesús sobre el fallecimiento de la menor.

Luego de la investigación administrativa, el 5 de diciembre de 2013, la Investigadora rindió el *Informe investigación administrativa,* en el cual concluyó que se identificaron fallas por parte de la TS De Jesus y la señora Flores sobre el manejo de los dos primeros referidos, al incumplir con las normas y procedimientos de la

---

conflictos que estaban confrontando con la señora Vega. Véase pág. 446, anejo 17 de la recurrida.

[12] La TS De Jesús tuvo varias comunicaciones telefónicas con la señora Vega, el abuelo paterno y el padre de las menores. Además, le ofreció transportación a la señora Vega para que asistiera a las citas médicas de las menores. Las menores acudieron a sus citas médicas para ser evaluadas, sin que se reportara algún indicador de maltrato. La TS De Jesús, mientras se le ofrecieron los servicios a la familia, observó que las menores estaban bien cuidadas, con buena higiene y saludables. Véase pág. 312, anejo 17 de la recurrida.

[13] Véase pág. 313, anejo 17 de la recurrida.

[14] El informante del Centro Médico indicó que la menor Y.M.I.V. presentó un sangrado cerebral interno y que la menor se encontraba entubada y en estado comatoso.

agencia. La Investigadora recomendó la imposición de medidas disciplinarias a la TS De Jesús y a la señora Flores. Dicha recomendación se fundamentó en los hallazgos encontrados y en la falta de personal en la Oficina Local de Ponce II.

Es menester destacar que, transcurridos dos (2) años y seis (6) meses[15] desde la entrega del *Informe investigación administrativa*, la señora Flores recibió el 14 de junio de 2016, por medio de carta, la notificación de intención de destitución[16]. El DF basó su determinación en que la señora Flores falló al no manejar y atender el caso adecuadamente, según las exigencias normativas vigentes al momento de los hechos contenidas en el *Manual de Normas, Procedimientos y Estándares de Ejecución sobre el Modelo de Seguridad en la Investigación de Referidos de Maltrato de Menores, ADFAN (septiembre 2008)* ("Modelo de Seguridad") y el *Manual de Normas y Procedimientos de Continuo de Servicios de Protección Social a Menores (octubre 2006)* ( "Manual de Continuo de Servicios"). Siendo estas las circunstancias, el DF determinó que la señora Flores incumplió con los deberes impuestos por la Ley Núm. 184-2004, *Ley para la Administración de los Recursos Humanos en el Servicio Público*, y el *Manual de Normas y Procedimientos Internos sobre Acciones Administrativas (1998)* ("Manual de Acciones Administrativas") del DF. Luego de los procesos administrativos, el 28 de julio de 2017, la señora Flores fue destituida de su puesto[17], luego de celebrarse la vista administrativa y ser debidamente notificada[18] de su derecho a apelar dicha determinación.

---

[15] Surge del legajo apelativo que, la señora Flores continúo trabajando en el DF como supervisora hasta el recibo de la carta de destitución del 28 de julio de 2017. Véase anejo XXVII del recurrente.

[16] La carta de intención de destitución copia los hallazgos del informe de la Investigadora, enumera las obligaciones contenidas en la Ley Núm. 184 del 3 de agosto de 2004, además, incluye la normativa establecida en el Modelo de Seguridad, el Código de Ética Profesional del Colegio de Trabajadores Sociales de Puerto Rico, así como le apercibe de sus derechos a solicitar vista administrativa.

[17] La Oficial Examinadora del foro administrativo de la agencia acogió las recomendaciones de la Investigadora, entiéndase, que procedía una reprimenda escrita. Anejo 17 de la recurrida.

[18] Anejo 27 de la recurrida.

El 29 de agosto de 2017, la señora Flores compareció ante la CASP mediante una apelación. En dicho escrito, impugnó la determinación del DF de destituirla del puesto de Supervisora de Trabajo Social I. Luego de varios trámites procesales, la vista pública en su fondo se celebró ante la Oficial Examinadora de CASP, Maribel Rodríguez Ramos, durante los días 22 de febrero de 2022, 23 de mayo de 2022, 18 y 19 de agosto de 2022, 9 de septiembre de 2022 y 7 de octubre de 2022. En su informe, rendido el 11 de octubre de 2023, la Oficial Examinadora concluyó que la destitución no era proporcional como medida disciplinaria ante las faltas halladas en la vista pública en su fondo y que, en su lugar, procedía una reprimenda escrita.

El 13 de diciembre de 2023, mediante *Resolución*, la CASP adoptó el informe de la Oficial Examinadora. Así, se declaró Ha Lugar la Apelación incoada por la señora Flores y se ordenó al DF dejar sin efecto la medida disciplinaria impuesta a la señora Flores y sustituirla por una reprimenda escrita, además, se ordenó remover la carta de destitución del expediente de personal de la señora Flores. Asimismo, se ordenó al DF pagarle a la señora Flores los salarios y beneficios marginales dejados de percibir por el tiempo que estuvo destituida de su puesto.

El informe de la Oficial Examinadora de la CASP consignó las siguientes determinaciones de hecho, las cuales hacemos formar parte de nuestro dictamen para ilustrar en detalle el motivo de la presente controversia:

> 1. La [Sra. Flores] comenzó a trabajar en el Departamento de la Familia el 15 de noviembre de 2007, ocupando el puesto de Trabajadora Social I en la Oficina Regional de Ponce, adscrita a la ADFAN.
>
> 2. En julio de 2008 la [Sra. Flores] fue nombrada al puesto de Supervisora en Trabajo Social I, en la Oficina Local de Ponce II, adscrita a la ADFAN.
>
> 3. La Trabajadora Social Jésica De Jesús Laracuente (TS De Jesús) laboraba en la Oficina Local de Ponce II, bajo la supervisión de la [Sra. Flores].

4. El 28 de noviembre de 2011, a la 1:51 p.m., se recibió un referido contra la Sra. Anaís Vega Sepúlveda, sobre maltrato físico y negligencia hacia su hija infante de seis (6) meses, Y.I.V., en la Línea de Maltrato a Menores del Departamento de la Familia (primer referido).

5. El informante era anónimo, no ofreció su número de teléfono, ni dirección. Únicamente ofreció la dirección residencial de la madre de la infante.

6. El informante narró que la madre agredía a la infante en diferentes partes del cuerpo con las manos. Alegó que la menor presentaba un brazo inmóvil y un muslo hinchado, aunque desconocía si esta situación se debía a los golpes que le propinaba la madre. Al momento de hacer el referido no estaba ocurriendo ninguna situación.

7. El informante, comentó que cuando la menor lloraba la madre le gritaba palabras soeces. Indica el referido que se desconoce qué palabras esta utilizaba.

8. La Línea de Maltrato transfirió el primer referido a la Unidad de Investigaciones Especializadas (UIE) de Ponce, anteriormente conocida como PES, y esta por instrucciones administrativas asignó el referido a la Oficina Local de Ponce II, a las 2:59 p.m., a pesar de que la Sra. Anaís Vega Sepúlveda no contaba con un caso activo en dicha oficina.

9. La [Sra. Flores] recibió el primer referido de la UIE, pero al no contar la señora Vega Sepúlveda con un caso activo en la Oficina Local de Ponce II, esta se comunicó con el Director Regional, Sr. Lediff Sánchez, para objetar la transferencia del referido a dicha oficina, ya que en estos casos le correspondía investigar a la UIE y porque la señora Vega había sido custodia de la Oficina cuando era menor de edad.

10. El señor Sánchez determinó que la Oficina Local de Ponce II llevaría a cabo la investigación del primer referido, sin dar otras recomendaciones, ni instrucciones adicionales.

11. Siguiendo las directrices impartidas por el señor Sánchez, la [Sra. Flores] entró al sistema mecanizado SIRCSe, y procedió a leer, imprimir y evaluar el referido.

12. La [Sra. Flores] asignó el primer referido a la TS De Jesús, a las 4:31 p.m., en el sistema mecanizado SIRCSe.

13. La [Sra. Flores] discutió con la TS De Jesús las alegaciones reportadas en el primer referido y le asignó la prioridad de respuesta, para que atendiera el referido de forma inmediata, en respuesta a peligro presente, y le impartió instrucciones para que visitara a la familia ese mismo día.

14. El 28 de noviembre de 2011, el mismo día en que se recibió el referido, la TS De Jesús acudió a la dirección indicada en el referido.

15. La TS De Jesús no encontró a nadie en la dirección indicada en el referido, ni en el vecindario, y procedió a dejar una nota por debajo de la puerta de la residencia, dirigida a la señora Vega Sepúlveda, informándole sobre el referido y solicitándole que se comunicara al número de teléfono señalado.

16. El 29 de noviembre de 2011, en horas de la tarde, la TS De Jesús regresó a la dirección indicada en el referido para tratar de contactar a la familia, pero no tuvo éxito.

17. En horas de la noche del 29 de noviembre de 2011, aproximadamente a las 8:00 p.m., la TS De Jesús recibió la llamada del Sr. Luis Gabriel Irizarry Natal, padre de la menor Y.I.V., quien informó la dirección correcta, porque la persona que recibió la nota en la dirección que indicaba el referido lo contactó.

18. La dirección provista en el referido no era correcta y el informante era anónimo, por lo que la TS De Jesús no tuvo manera de corroborarla.

19. El 30 de noviembre de 2011, en horas de la mañana, la TS De Jesús visitó la residencia de los padres de la menor para hacer la evaluación de peligro presente.

20. La TS De Jesús le informó e interpretó el referido a la señora Vega Sepúlveda. Mientras que el padre de la menor no se encontraba en la residencia, debido a que este estaba trabajando.

21. Luego de que la TS De Jesús hiciera las observaciones y evaluaciones correspondientes no encontró marcas o golpes visibles en las menores, la menor Y.I.V. movía su brazo y se encontraba alerta, la condición de la vivienda era favorable y no se identificaron riesgos de seguridad.

22. La TS De Jesús discutió los hallazgos con la [Sra. Flores] y esta determinó que se completara el documento SF-15, para que la señora Vega Sepúlveda llevara a las menores a una evaluación médica y poder tomar otras decisiones y así la TS De Jesús lo hizo.

23. El 1 de diciembre de 2011, a las 4:20 a.m., se recibió en la Línea de Maltrato, un segundo referido por parte del informante, Dr. Juan Méndez, del Hospital Dr. Pila de Ponce, contra los padres de la menor Y.I.V.

24. En el segundo referido el informante indicó posible negligencia hacia infante de seis (6) meses de edad por parte de la madre.

25. El informante alegó que la madre le indicó que dejó a la infante sola y esta se lastimó la pierna derecha al introducirla entre las barandas de la cuna. Alegó que la madre se percató de la situación cuando observó la hinchazón en la pierna derecha de la infante.

26. El informante indicó que la menor fue llevada al Hospital Dr. Pila de Ponce donde fue evaluada y se le diagnosticó fractura en la pierna derecha y fue referida al Centro Médico de Río Piedras.

27. El informante entiende, según su criterio profesional, que la gravedad de la fractura de la infante es de tal magnitud que no es compatible con la versión ofrecida sobre cómo la menor se lastimó.

28. La Línea de Maltrato transfirió el referido a la UIE, donde el personal realizó una búsqueda en el sistema y encontró que la señora Vega Sepúlveda contaba con un caso activo en la Oficina Local de Ponce II, con el referido R11-11-48223, asignado a la TS De Jesús (primer referido).

29. Personal de la UIE informó del segundo referido a la TS De Jesús, a las 8:40 a.m.

30. Un Supervisor de la UIE de Ponce transfirió el expediente electrónico del segundo referido a la Oficina Local de Ponce II, a las 9:01 a.m., para la acción correspondiente, debido a que la señora Vega Sepúlveda contaba con un caso activo en dicha oficina.

31. La TS De Jesús se comunicó con la [Sra. Flores] y le informó que estaba trabajando un segundo referido contra los padres de la menor Y.I.V.

32. La [Sra. Flores] asignó el segundo referido a la TS De Jesús en el sistema SIRCSe, el 1 de diciembre de 2011, a las 3:21 p.m.

33. La [Sra. Flores] asignó el segundo referido a la TS De Jesús para que lo investigara en conjunto con el primer referido. No lo asignó a través del formulario Hoja de Asignación de Referidos-002, no se estableció prioridad de respuesta, ni se ofrecieron recomendaciones.

34. La [Sra. Flores], una vez se enteró del segundo referido hizo gestiones para comunicarse con el personal del Centro Médico. La TS del Centro Médico, la Sra. Amalie Torres, le indicó que la situación era estable, que habían entrevistado a la madre y estaban evaluando a la menor, por lo que era necesario que le brindaran espacio y que se estarían comunicando para la discusión del caso, tan pronto ellos lo autorizaran.

35. El 6 de diciembre de 2011, la TS Torres del Centro Médico se comunicó telefónicamente con la [Sra. Flores] y le informó los hallazgos que surgieron de la intervención médica de la menor Y.I.V. Le manifestó que las fracturas que presentaba la menor eran sugestivas a maltrato físico y que esta sería operada, pero que se desconocía cuándo. Le señaló que un médico evaluaría la posibilidad de que, las fracturas se debían a alguna condición orgánica o fisiológica que tuviera la menor, como osteogénesis imperfecta o "huesos de cristal". Además, le indicó que la TS De Jesús comparecería al hospital el 9 de diciembre de 2011.

36. El 7 de diciembre de 2011, la TS De Jesús realizó la primera intervención en el segundo referido y entrevistó al padre de las menores en su hogar y este no reportó ninguna situación extraña por parte de la señora Vega hacia las menores.

37. El 9 de diciembre de 2011, la TS De Jesús discutió el caso con la Sra. Brenda Mirabal y la TS Torres del Centro Médico. La doctora Mirabal le señaló que la menor no había sido atendida por un pediatra desde el mes de nacida y que los hallazgos encontrados no tenían explicación y que le ofrecería seguimiento en su oficina.

38. La doctora Mirabal y la TS Torres recomendaron a la TS De Jesús establecer un plan de seguridad en el cual la madre estuviera bajo supervisión, mientras le brindaban los servicios médicos y del Departamento a la menor. Esto debido a que el padre de la menor no podía supervisarla por estar trabajando y se identificaron como recursos de apoyo a los abuelos paternos de las menores.

39. El 9 de diciembre de 2011, luego de que la TS De Jesús discutiera los hallazgos con la [Sra. Flores] se fundamentó el

primer referido a nombre de la señora Vega, bajo la tipología de negligencia médica. Ello basado en que la señora Vega no había llevado a la menor a un pediatra desde que esta tenía un mes de nacida.

40. La TS De Jesús estableció un plan de seguridad en el hogar de los abuelos paternos, donde la señora Vega Sepúlveda estaría bajo la supervisión de estos hasta que la señora Vega cumpliera con los servicios de la agencia y la menor Y.I.V. los servicios médicos.

41. El 12 de diciembre de 2011, se efectuó una reunión en la Oficina Local de Ponce II donde estuvo presente la señora Vega Sepúlveda, los abuelos paternos de las menores, la [Sra. Flores] y la TS De Jesús.

42. En la reunión, la [Sra. Flores] le interpretó a la familia que el primer referido se fundamentó por negligencia médica, descartando maltrato físico, ya que la madre de la menor no la había llevado a evaluar desde que esta tenía un mes de nacida. Además, se les indicó la necesidad de establecer un Plan de Acción Protectora (PAP) para asegurar la seguridad de las menores, mientras se daba el proceso de evaluación completa del segundo referido, sobre las fracturas de la menor, y se completara un plan de servicios. Ello con el propósito de preservar la unidad familiar y no tener que remover a las menores.

43. El PAP que se estableció consistió en que los padres de las menores residirían con estas en el hogar de los abuelos paternos, quienes supervisarían a la señora Vega y a las menores. Las partes estuvieron de acuerdo con dicho plan.

44. El PAP fue firmado y establecido el 12 de diciembre de 2011. El mismo señala que su vigencia inició el 9 de diciembre de 2011 y se extendía hasta el 9 de enero de 2012.

45. El 12 de diciembre de 2011, la familia de la menor fue a residir a la casa de los abuelos paternos.

46. La TS De Jesús estableció un Plan de Servicios a la familia, relacionado a los dos referidos.

47. El Plan de Servicios para los padres consistió en que estos asistieran a los talleres de la Escuela para la Vida en Familia del Módulo Psicoeducativo para el Fortalecimiento Familiar, una vez a la semana, y que la madre de la menor fuera referida a la Clínica Conductual APS para una evaluación psicológica, de la Escuela de Medicina de Ponce.

48. El Plan de Servicios para las menores consistió en que estas fueran llevadas a visitas de seguimiento cada tres (3) meses al pediatra y visitas al hogar donde estas estaban ubicadas, por parte de la TS De Jesús.

49. La TS De Jesús extendió el PAP por 30 días adicionales, del 10 de enero hasta el 10 de febrero de 2012, hasta que la familia culminara de recibir los servicios del Departamento.

50. La [Sra. Flores] estuvo de vacaciones del 11 de diciembre de 2011 hasta el 27 de enero de 2012 y regresó a la Oficina Local el 30 de enero de 2012.

51. La Sra. Mildred Martínez, Supervisora de TSF de la Oficina Local de Ponce II, cubrió a la [Sra. Flores] mientras esta estuvo de vacaciones.

52. El 27 de enero de 2012, la TS De Jesús realizó la primera visita al hogar de los abuelos paternos de la menor y tuvo el primer contacto con la familia. Específicamente entrevistó a la señora Vega y observó a las menores. Además, evaluó la residencia y verificó si las necesidades básicas estaban cubiertas.

53. El 2 de febrero de 2012, la señora Vega Sepúlveda visitó a la TS De Jesús en la Oficina Local de Ponce II para hacer entrega del expediente médico de la menor Y.I.V.

54. Los padres de la menor asistieron al primer taller para padres, como parte del Plan de Servicios establecido, ante la TS Leonora Rivera Reyes, quien fue el recurso asignado.

55. En la primera sesión del taller el padre de la menor informó que no asistiría a los talleres porque en su trabajo no se lo permitirían.

56. La TS Leonora Rivera Reyes le explicó al padre de la menor Y.I.V. la importancia de cumplir el plan de servicio; sin embargo, no se le podía obligar a participar de los talleres, toda vez que el primer referido fue fundamentado a la madre.

57. La señora Vega Sepúlveda asistió y completó exitosamente los talleres de la Escuela para la Vida en Familia del Módulo Psicoeducativo para el Fortalecimiento Familiar. El 25 de mayo de 201[2], se le otorgó el certificado de cumplimiento.

58. El 5 de junio de 2012, la TS De Jesús entrevistó al Sr. Luis A. Irizarry Natal [Correa], abuelo paterno de las menores y este le informó los problemas y conflictos que estaban confrontando con la señora Vega.

59. La TS De Jesús tuvo varias comunicaciones telefónicas con la señora Vega, el abuelo paterno y el padre de las menores. Además, le ofreció transportación a la señora Vega para que asistiera a las citas médicas de las menores.

60. El 14 de junio de 2012, la señora Vega Sepúlveda acudió a la Clínica Conductual APS y fue evaluada por la Dra. Jéssica Serrano, psicóloga. Esta concluyó que al momento no presentaba indicadores de depresión, ni condición que requiriera tratamiento psicológico o psiquiátrico en la clínica.

61. Las menores acudieron a sus citas médicas para ser evaluadas, sin que se reportara algún indicador de maltrato.

62. La TS De Jesús, mientras se le ofrecieron los servicios a la familia, observó que las menores estaban bien cuidadas, con buena higiene y saludables.

63. El 17 de septiembre de 2012, la TS De Jesús discutió el caso con la [Sra. Flores] y esta le indicó que procediera con el cierre del caso, ya que la señora Vega cumplió con el plan de servicios y no había indicadores de maltrato.

64. El 17 de septiembre de 2012, la TS De Jesús le informó a la señora Vega el cierre de su caso, ya que se cumplió con el plan de servicios.

65. El 1 de octubre de 2012, los padres de las menores y estas se mudaron a su residencia.

66. La Oficina Local de Ponce II confrontó una falta de personal que estaba afectando sus operaciones. Entre los meses de enero a septiembre de 2012, la oficina estuvo operando con tres (3) empleados, a saber, la TS De Jesús, la [Sra. Flores] y la Supervisora de Técnicos de Servicios, Mildred Martínez.

67. La [Sra. Flores] sometió varias comunicaciones, dirigidas a la Directora de la Oficina Local de Ponce II y a la Directora de la Región de Ponce, exponiendo la problemática sobre la falta de personal que afectaba las operaciones de la Oficina Local de Ponce II y solicitando la asignación de recursos adicionales.

68. La TS De Jesús tenía asignado la mayoría de los casos y la atención de emergencias surgidas en la oficina, debido a la falta de personal en la Oficina Local de Ponce II.

69. El 1 de diciembre de 2012, se recibió en la Línea de Maltrato el referido, R12-11-46508 (tercer referido), a nombre de los padres de la menor Y.I.V.

70. En el tercer referido, personal del Centro Médico de Río Piedras informó situación de maltrato físico por parte de la madre y negligencia por parte del padre hacia una menor de un (1) año.

71. El informante indicó que la menor llegó al hospital durante la noche del 31 de octubre de 2012, presentando un sangrado cerebral interno y que la menor se encontraba entubada y en estado comatoso, teniendo que ser trasladada al Centro Médico.

72. El informante indicó que la madre tiró a [la] menor en su cuna de forma brusca, sufriendo la infante trauma en la cabeza.

73. El informante señaló que no era la primera vez que la madre le causaba daño físico a su hija, ya que hacía nueve (9) meses le ocasionó fractura del fémur, situación que es de conocimiento del padre y no ha intervenido en favor de su hija.

74. El 1 de noviembre de 2012, la TS de la UIE inició la intervención en el tercer referido, en el Centro Médico, ya que este surgió en horas de la madrugada y la familia contaba con antecedentes de maltrato de menores asignados a la Oficina Local de Ponce II.

75. El 1 de noviembre de 2012 la TS De Jesús acudió al Tribunal Municipal de Ponce a peticionar la custodia de emergencia de las menores Y.I.V. y B.I.V. y estas fueron ubicadas con los abuelos paternos.

76. El 2 de noviembre de 2012, personal del Centro Médico le notificó a la TS De Jesús el fallecimiento de la menor.

77. El 7 de junio de 2013, el padre de la menor Y.I.V. presentó una querella ante la ADFAN, relacionada al caso de la señora Vega, en la que solicitó una investigación administrativa por negligencia institucional por las intervenciones llevadas a cabo por el personal de la Oficina Local de Ponce II.

78. El 30 de agosto de 2013, el Sr. Luis G. Irizarry Natal y el Sr. Luis A. Irizarry Natal [Correa] presentaron una demanda en daños y perjuicios contra el Departamento de la Familia,

caso civil Núm. LDP2013-0039, por alegada negligencia en el manejo de los dos referidos de maltrato hacia la menor Y.I.V.

79. El 28 de octubre de 2013, la Sra. Olga Díaz Rodríguez, Supervisora de Trabajo Social I, inició la investigación administrativa sobre el manejo de los dos (2) referidos de maltrato de la Menor Y.I.V.

80. Como parte de la investigación administrativa, la señora Díaz Rodríguez entrevistó al Sr. Luis G. Irizarry Natal, padre de la menor Y.I.V., al Sr. Luis A. Irizarry Natal [Correa], abuelo paterno de la menor, la TS De Jesús y a la [Sra. Flores].

81. El 6 de diciembre de 2013 la señora Díaz Rodríguez emitió el Informe de la investigación administrativa.

82. En el informe de la investigación administrativa, la señora Díaz Rodríguez detalló los hallazgos de las intervenciones de la TS De Jesús y la [Sra. Flores] en los dos (2) referidos de maltrato de la menor Y.I.V.

83. La señora Díaz Rodríguez concluyó que se identificaron fallas por parte de la TS De Jesús y la [Sra. Flores] en los procesos de investigación de los dos (2) referidos, así como en el manejo del caso a nombre de la señora Vega. Además, determinó que la investigación de los referidos e intervenciones con la familia de la menor no estuvieron enmarcados en las normas y procedimientos establecidos en la agencia.

84. La señora Díaz Rodríguez recomendó la imposición de medidas disciplinarias a la TS De Jesús y a la [Sra. Flores], que estuvieran acorde con los hallazgos. Recomendó que como atenuantes al evaluar las medidas disciplinarias se considerara la falta de recursos humanos que existía en la Oficina Local de Ponce II en el periodo que cubre la investigación y las evaluaciones satisfactorias sobre el desempeño de las funciones de la TS De Jesús.

85. El 2 de mayo de 2016, el TPI dictó una Sentencia en el caso [de] daños y perjuicios incoada por el padre y abuelo paterno de la menor Y.I.V. en la que determinó que no se probó la negligencia del Departamento de la Familia, ni el nexo causal con los daños sufridos por la parte demandante.

86. El 14 de junio de 2016, la [Sra. Flores] recibió la notificación de intención de destitución del puesto de Supervisora de Trabajo Social I. Además, se le apercibió de su derecho a solicitar una vista administrativa informal, dentro de diez (10) días calendarios.

87. Del 20 al 23 de junio de 2016, la [Sra. Flores] efectuó un viaje oficial a Tampa, Florida, donde fungió como perito en un caso de custodia de un menor.

88. El 28 de noviembre de 2016, se celebró la vista administrativa informal ante una Oficial Examinadora.

89. El 21 de diciembre de 2016, la Oficial Examinadora rindió un informe en el que acogió las conclusiones del informe de la investigación administrativa.

90. El 31 de julio de 2017, la [Sra. Flores] fue seleccionada para participar de un adiestramiento para la implementación de la estrategia de mesas redondas en [la] región de Ponce y en cumplimiento del Plan Estatal.

91. El 7 de agosto de 2017, la [Sra. Flores] recibió la carta en que la Autoridad Nominadora en la que le notificó la destitución del puesto de Supervisora de Trabajo Social I. En ella le apercibió de su derecho de apelar la determinación ante la CASP, dentro de los treinta (30) días del recibo de la comunicación.

92. La [Sra. Flores], previo a la destitución, no había sido objeto de ninguna acción correctiva, ni medida disciplinaria.

93. Al momento de la destitución, la [Sra. Flores] devengaba un sueldo mensual de dos mil cuatrocientos ochenta y ocho dólares ($2,488).

Para concluir estas determinaciones de hecho, la Oficial Examinadora examinó la prueba presentada en las vistas públicas celebradas entre el 22 de febrero de 2022 al 7 de octubre de 2022. Consignados estos hechos, la Oficial Examinadora realizó un análisis en cuanto a las faltas señaladas por el DF contra la señora Flores en el *Informe Investigación Administrativa* de 5 de diciembre de 2013. A continuación, exponemos las faltas señaladas por el DF, seguidas de la determinación de la Oficial Examinadora de si se cometieron o no:

Falta #1:

La Supervisora Flores falló al no evaluar el contenido de los referidos R11-11-48223 y el R11-12-48729, una vez los recibió en la Oficina Local, ni determinó la prioridad de respuesta según las amenazas de peligrosidad establecidas en las alegaciones de los referidos.

Falta #2:

La Supervisora Flores falló en la Etapa de Pre-contacto en la investigación de los referidos R11-11-48223 y R11-12-48729:
a. No utilizó el formulario "Resumen para la Asignación de Referidos en el Servicio de Protección a Menores, ADFAN-SFN-NV-002" al momento de asignar los referidos R11-11-48223 y R11-12-48729 a la TS De Jesús. Tampoco registró en el sistema SIRCSe la prioridad de respuesta determinada para la atención de estos referidos, ni sus recomendaciones para la investigación correspondiente.
b. No se evidencia que la Supervisora discutiera la asignación de los referidos R11-11-48223 y R11-12-48729 a la TS De Jesús, así como las recomendaciones para la atención de estos.

Falta #3:

La Supervisora Flores falló al no asegurar que la TS De Jesús cumpliera con la prioridad de respuesta que los referidos ameritaban.

Falta #4:

No se evidencia que la Supervisora Flores revisara y aprobara la investigación de los referidos correspondientes a la Sra. Anaís Vega Sepúlveda y su familia. Esta no garantizó que las investigaciones realizadas por la Trabajadora Social De Jesús cumplieran con los estándares y procedimientos establecidos en la agencia.

a. No se evidencia que corroborara que la TS cumpliera con la Evaluación de Peligro Presente del primer y segundo referido.

b. No revisó ni aprobó el "Informe de Intervención con Referidos de Maltrato Negligencia a Menores", ADFAN-SFN-INV-006 (evaluación de seguridad) en los dos referidos.

c. No aseguró que en la investigación del primer y segundo referido, trabajados por la TS De Jesús, la recopilación de información cumpliera con los estándares de suficiencia y pertinencia en las seis áreas de avalúo familiar. Tampoco revisó las decisiones tomadas por la TS respecto a la seguridad de la menor.

d. No se evidencia notificación de acción tomada con el primer y segundo referido.

e. No se aseguró que la TS De Jesús cumpliera con el término de tiempo establecido de 30 días calendarios, a partir del recibo del referido, para completar la investigación del primer y segundo referido. De acuerdo al sistema SIRCSe, la FN-81 del primer referido fue completada el 21 de diciembre de 2012 con fundamento. El segundo referido, se encuentra bajo investigación, pero se creó otra FN-81 de cese de servicios.

Falta #5:

Según documentación del expediente, no se evidencia a qué fecha la Supervisora Giselle Flores activó el caso de la Sra. Anaís Vega Sepúlveda, bajo el referido inicial R11-11-48223, del 28 de noviembre de 2011. Tampoco se evidencia a qué fecha se determinó acciones con el referido R11-12-48729, del 1 de diciembre de 2011.

Falta #6:

Giselle Flores no cumplió con las tareas de supervisora en la Etapa de Compromiso. Ésta no asignó el caso de la Sra. Anaís Vega Sepúlveda a la Trabajadora Social Jésica de Jesús Laracuente o algún trabajador social. En el expediente social no se evidencia el formulario Resumen de la Situación para la Asignación de Casos de Protección Social a Menores, ADFAN-SFN-PSM-004, donde establezca las recomendaciones y tareas a ser realizadas por el manejador de caso.

Falta #7:

La Supervisora Flores falló al avalar y endosar la intervención de la TS De Jesús desde la etapa de investigación, durante la etapa del manejo del caso hasta llegar al cierre del mismo, según se ha detallado en este informe.

a. La supervisora falló al endosar un Plan de Acción Protectora que no estaba alineado con el procedimiento establecido, ni con la situación familiar presentada al momento de su elaboración.

b. La TS De Jesús no completó la Evaluación de Peligro Presente del segundo referido.

c. Se extendió el Plan de Acción Protectora el 10 de enero de 2012 hasta el 10 de febrero de 2012. De este último no se evidencia revisión y aprobación de la Supervisora Flores.
d. La Supervisora Flores no garantizó que la TS De Jesús cumpliera con el monitoreo de los acuerdos con la familia, así como la evaluación de la seguridad de las menores.
e. A pesar de que la TS De Jesús completó la notificación de cierre de caso, no se evidencia que la Supervisora Flores evaluara y discutiera esa determinación.
f. Luego de un mes de la TS De Jesús haber cerrado el caso, surgió el incidente de maltrato reportado a la Línea el 1 de noviembre de 2012, el cual culminó en la muerte de la menor Y.I.V. de un año.

En resumidas cuentas, la Oficial Examinadora concluyó que las faltas #1, #2, #3 y #6 no fueron cometidas, mientras que las faltas #4 y #5 sí fueron cometidas. Por otra parte, encontró que la falta #7 fue cometida solo en la medida en que no se aseguró de documentar adecuadamente la investigación ni el manejo de los referidos. Más adelante, tendremos oportunidad de desglosar los fundamentos de la Oficial Examinadora en su determinación, cuando discutamos propiamente la controversia en mano de si se le debe deferencia a la CASP en sus conclusiones.

En su conclusión, la Oficial Examinadora de la CASP estimó que la destitución no era la medida disciplinaria correspondiente a las faltas probadas de la señora Flores, a la luz del Manual de Acciones Administrativas de 1998 y la Ley Núm. 184-2004. Por lo cual, recomendó revocar la destitución ordenada por el DF y ordenar, en su lugar, una reprimenda escrita como medida disciplinaria en su informe de 11 de octubre de 2023. La CASP acogió dicho Informe y lo hizo formar parte de su *Resolución* del 13 de diciembre de 2023, efectivamente, declarando Ha Lugar la Apelación incoada por la señora Flores y ordenando al DF a dejar sin efecto la medida disciplinaria impuesta y sustituirla por una reprimenda escrita. Inconforme, el recurrente presentó una *Moción Solicitando la Reconsideración* el 26 de diciembre de 2023, la cual fue denegada el 4 de enero de 2024.

Ante este cuadro fáctico, el recurrente acudió a este Tribunal el 5 de febrero de 2024, mediante *Recurso de Revisión Administrativa,* para solicitarnos que revoquemos la *Resolución* dictada por la CASP. En dicho recurso, señala los siguientes errores:

> La Comisión Apelativa del Servicio Público erró y abusó de su discreción al determinar que la señora Flores no cometió varios de los hallazgos imputados y probados, emitiendo así una determinación que no está basada en la totalidad del expediente administrativo.

> La Comisión Apelativa del Servicio Público erró tanto al sustituir irrazonablemente el criterio y discreción de la autoridad nominadora como al ordenar la sustitución de la medida disciplinaria de destitución por una reprimenda escrita.

El 6 de marzo de 2024, la recurrida presentó su *Alegato en Oposición a Recurso de Revisión Administrativa.* Luego de varios incidentes procesales concernientes a la Transcripción de la Prueba Oral ("TPO"), el 23 de septiembre de 2024, el DF presentó un *Alegato Suplementario,* el cual la recurrida contestó el 1 de noviembre de 2024 en su *Moción de Réplica a Alegato Suplementario.* Con el beneficio de la comparecencia de todas las partes y examinados los escritos de las partes, la prueba documental y la TPO, estamos en posición de resolver.

**II.**

**-A-**

En materia administrativa, nuestra función revisora tiene como norte delinear la discreción de las entidades administrativas para garantizar que sus decisiones se encuentren en el marco de los poderes delegados y que sean consecuentes con la política pública que las origina[19]. En esa encomienda, debemos conceder deferencia a las decisiones que tomen las agencias administrativas[20]. Esto, debido a la especialidad y experiencia que tiene cada agencia en torno a las áreas específicas que regula[21].

---

[19] *Torres Rivera v. Policía de PR,* 196 DPR 606, 625-26 (2016); *Mun. de San Juan v. JCA,* 149 DPR 263, 279 (1999).
[20] *Comisionado Seguros PR v. Integrand,* 173 DPR 900, 914 (2008).
[21] *Mun. de San Juan v. CRIM,* 178 DPR 163, 175 (2010).

El alcance de la revisión judicial de las decisiones de las agencias está limitado por la Sección 4.5 de la LPAU[22]. En específico, la revisión judicial de una determinación administrativa se limitará a los siguientes asuntos: (1) la concesión del remedio apropiado; (2) si las determinaciones de hechos de las decisiones de la agencia están sostenidas por evidencia sustancial que obra en el expediente administrativo, y (3) la revisión de las conclusiones de derecho en todos sus aspectos[23].

A la luz de lo anterior, los foros judiciales intervendrán en las determinaciones administrativas cuando las agencias actúen arbitraria, ilegal o irrazonablemente[24]. En ese ejercicio, el criterio rector será la razonabilidad de la actuación de la agencia[25]. Así, las determinaciones de hecho se sostendrán por los tribunales si las mismas se basan en evidencia sustancial que surja de la totalidad del expediente administrativo[26]. No obstante, las determinaciones de derecho se pueden revisar en su totalidad[27].

Lo cierto es que "una decisión administrativa goza de una presunción de legalidad y corrección que debe respetarse, mientras la parte que las impugna no demuestra con suficiente evidencia que la decisión no está justificada"[28]. Esto significa que "[s]i la interpretación de los hechos es razonable, los tribunales, de ordinario, deben sostener el criterio de la agencia y no sustituirlo por el suyo"[29]. En conclusión, únicamente procederá revocar una determinación de hecho de una agencia cuando resulte irrazonable o cuando actuó de forma arbitraria o ilegal[30].

---

[22] 3 LPRA sec. 9675.
[23] *Íd.*; *Batista, Nobbe v. Jta. De Directores*, 185 DPR 206, 217 (2012).
[24] *JP Plaza Santa Isabel v. Cordero Badillo*, 177 DPR 177, 187 (2009).
[25] *Otero v. Toyota*, 163 DPR 716, 727 (2005).
[26] *Rolón Martínez v. Supte. Policía*, 201 DPR 26, 36 (2018).
[27] *Torres Rivera v. Policía de PR*, *supra*, pág. 627.
[28] *Henríquez v. Consejo de Educación Superior*, 120 DPR 194, 210 (1987).
[29] *Misión Ind. PR v. JP*, 146 DPR 64, 131 (1998).
[30] *JP Plaza Santa Isabel v. Cordero Badillo, supra*, en la pág. 187.

**-B-**

Un empleado de carrera tiene un interés propietario protegido sobre su empleo, ya sea protegido por ley o cuando exista una expectativa de continuidad sobre el mismo[31]. En atención al debido proceso de ley, una agencia solo podrá destituir a un empleado de carrera por justa causa, previa notificación de formulación de cargos por escrito y apercibimiento de su derecho a solicitar vista previa[32]. Por tratarse de un interés propietario, durante una vista formal ante una agencia para atender la suspensión o destitución de un funcionario público, se requiere un *quantum* de prueba más riguroso que el de la mera preponderancia de prueba, es decir, se requiere el estándar probatorio de prueba clara, robusta y convincente[33]. Sobre este estándar, se ha establecido que, aunque el mismo "no es susceptible de una definición precisa, la prueba clara, robusta y convincente ha sido descrita como aquella evidencia que produce en un juzgador de hechos una convicción duradera de que las contenciones fácticas son altamente probables"[34]. Este estándar de prueba es más exigente que el de la preponderancia de la prueba, pero menos riguroso que el de prueba más allá de duda razonable[35].

Los hechos que motivaron la medida disciplinaria impuesta a la señora Flores ocurrieron durante la vigencia de la Ley Núm. 184-2004, conocida como *Ley para la Administración de los Recursos Humanos en el Servicio Público del Estado Libre Asociado de Puerto Rico*[36]. Esta estableció como política pública lo siguiente:

> Reafirmar el mérito como el principio que regirá el Servicio Público, de modo que sean los más aptos los que sirvan al Gobierno y que todo empleado sea seleccionado, adiestrado, ascendido, tratado y retenido en su empleo en consideración al mérito y capacidad, sin discrimen, conforme a las leyes aplicables, incluyendo discrimen por razón de raza, color,

---

[31] *Orta v. Padilla Ayala*, 131 DPR 227, 241 (1992); *Torres Solano v. PRTC*, 127 DPR 499 (1990).

[32] *Adventist Health v. Mercado Ortiz*, 171 DPR 255, 263-64 (2007).

[33] *In re Caratini Alvarado*, 153 DPR 575 (2001).

[34] *In re Ramos Mercado*, 165 DPR 630 (2005); *In re Soto Charraire*, 186 DPR 1019, 1028 (2012).

[35] *In re Salas Arana*, 188 DPR 339, 347 (2013).

[36] 3 LPRA sec. 1461 *et seq.*

sexo, nacimiento, origen o condición social, por ideas políticas o religiosas, edad, orientación sexual, identidad de género, por ser víctima o ser percibida como víctima de violencia doméstica, agresión sexual o acecho, condición de veterano, ni por impedimento físico o mental[37].

En cuanto a las disposiciones sobre la retención del empleo, expresa la Ley Núm. 184-2004 que "[l]os empleados de carrera con status regular tendrán seguridad en el empleo siempre que satisfagan los criterios de productividad, eficiencia, hábitos, actitudes, orden y disciplina que debe prevalecer en el servicio público"[38]. La Ley Núm. 184-2004 expone ciertos deberes que constituyen "obligaciones mínimas esenciales requeridas a todo empleado" so pena de la imposición de medidas disciplinarias en su contra; a continuación, alistamos aquellos pertinentes a nuestro caso:

(1) Realizar eficientemente y con diligencia las tareas y funciones asignadas a su puesto y otras compatibles con éstas que se le asignen;
(2) [Un empleado no deberá] [o]bservar conducta incorrecta o lesiva al buen nombre de la agencia o al Gobierno del Estado Libre Asociado de Puerto Rico[39].

Ante estos deberes mínimos, cuando la conducta de un empleado no se ajuste a las normas establecidas, cada agencia deberá tomar las medidas correctivas o acciones disciplinarias necesarias y adecuadas[40]. Entre estas medidas, la Ley Núm. 184-2004 considera la amonestación verbal, la reprimenda escrita, la suspensión de empleo y sueldo y la destitución[41].

Según nuestros principios jurídicos, las medidas disciplinarias impuestas a los empleados del servicio público deben guardar proporción con la falta cometida[42]. Conforme a dicho principio de proporcionalidad, nuestro Tribunal Supremo ha resuelto que "la destitución de un empleado o empleada del servicio

---

[37] *Íd.*, sec. 1461.
[38] *Íd.*, sec. 1462e.
[39] *Íd.*
[40] *Íd.*
[41] *Íd.*
[42] *Cruz Rivera v. Mun. de Guaynabo*, 205 DPR 606, 611 (2020) (Sentencia); *Torres Solano v. PRTC*, 127 DPR 499, 515 (1990).

público es un castigo extremo, que solo procederá ante conducta y actuaciones de eminente gravedad"[43]. Es decir, como regla general, las primeras ofensas no ameritan la destitución, solo procederá ante una primera ofensa en las siguientes circunstancias excepcionales:

> La falta o acto aislado que dé lugar a despido del empleado en primera ofensa ha de ser de tal seriedad o naturaleza que revele una actitud o un detalle de su carácter, tan lesivo a la paz y al buen orden de la empresa, que constituiría imprudencia esperar su reiteración para separarlo del establecimiento[44].

**-C-**

En atención a garantizar un proceso uniforme de medidas disciplinarias, el Departamento de la Familia adoptó en el 1998 el *Manual de Normas y Procedimientos Internos sobre Acciones Administrativas*[45]. EI propósito de este manual es establecer las normas de conducta y los procedimientos a seguir en los casos que se apliquen cesantías, medidas correctivas y medidas disciplinarias a los empleados del Departamento de la Familia[46].

En cuanto a su aplicabilidad, el Manual de Acciones Administrativas dicta que "será de aplicación a todos los empleados del DF a quienes se les notifique la intención de imponer una medida disciplinaria consistente en reprimenda, suspensión de empleo y sueldo 0 destitución, y en los casos de cesantías y medidas correctivas"[47].

> Por su parte, define *destitución* de la siguiente manera:
> [M]edida disciplinaria por violación a las normas de conducta que consiste en la separación total y absoluta del servicio impuesta a un empleado por la Autoridad Nominadora, como medida disciplinaria, por justa causa, previa formulación de cargos y celebración de Audiencia Administrativa. La misma formará parte del expediente de personal del empleado[48].

---

[43] *Rodrigo v. Tribunal Superior*, 101 DPR 151, 168 (1973).
[44] *Srio. del Trabajo v. ITT*, 108 DPR 536, 547 (1974).
[45] Depto. de la Familia, *Manual de Normas y Procedimientos Internos sobre Acciones Administrativas* (1998) [en adelante, "*Manual de Acciones Administrativas*"].
[46] *Íd.*
[47] *Íd.*, Art. II.
[48] *Íd.*, Art. III(8).

En lo aquí pertinente, el Manual de Acciones Administrativas desglosa los siguientes criterios para imponer una medida disciplinaria a un servidor público:

Cuando la conducta de un empleado no se ajusta a las normas de conducta establecidas, se le impondrán las medidas disciplinarias utilizando como guía el anejo a este Manual de Normas. **Como regla general, estas medidas se aplicarán en el orden sucesivo que aparecen en el anejo, según el empleado incurra o reincida en las infracciones**. No obstante, la Autoridad Nominadora, en el ejercicio de su discreción, podrá imponer medidas más severas si determina que la falta cometida por el empleado es de tal naturaleza 0 gravedad que así lo amerita.
. . . .
**Al proceder a determinar la medida correctiva o acción disciplinaria a aplicarse al empleado, deberán considerarse entre otros, los siguientes factores**: años de servicio, productividad, su expediente personal e historial de servicios, las reincidencias, la naturaleza de la falta que comete, combinación de infracciones en que incurra el empleado y la posición jerárquica dentro de la organización con relación a la infracción cometida.
**La medida correctiva o acción disciplinaria que se aplique debe estar sostenida por la prueba y guardar proporción con la infracción**.[49]

A manera de guía general, el Manual de Acciones Administrativas propone una tabla de medidas disciplinarias en la cual se establecen las distintas medidas disciplinarias adecuadas en orden sucesivo de menor a mayor gravedad para cada falta identificada[50]. Ahora bien, debemos tener en cuenta que se esclarece que las medidas disciplinarias propuestas en la tabla son "meramente ilustrativas y no exhaustivas con respecto a la violación cometida"[51]. Relevantes a nuestro caso son las faltas #3 y #5 según aparecen en la tabla: "Conducta impropia dentro o fuera del trabajo de tal naturaleza que afecte el buen nombre o refleje descredito o ponga en dificultad a la agencia, cualquier otra agencia o dependencia del gobierno" y "Realizar trabajo en forma negligente que afecte el buen nombre o refleje descredito o ponga en dificultad a la agencia, cualquier otra agencia o dependencia del gobierno",

---

[49] *Íd.*, Art. VIII, Sección 8.2 (énfasis suplido).
[50] *Íd.*, págs. 26-31.
[51] *Íd.*, Art. VIII, Sección 8.2.

respectivamente[52]. Es de notar que en la tabla para ninguna de estas dos faltas se recomienda la destitución como medida para una primera ofensa; más bien, se recomienda la reprimenda o la suspensión y se deja la destitución para una segunda o tercera ofensa[53].

**-D-**

Al destituir a la Recurrida, el Departamento de la Familia determinó, a base de la investigación administrativa, que la señora Flores incurrió en unas fallas que se apartan de las normas y procedimientos establecidos en el *Manual de Normas, Procedimientos y Estándares de Ejecución sobre el Modelo de Seguridad en la Investigación de Referidos de Maltrato de Menores*[54] de 2008 y el *Manual de Normas y Procedimientos de Continuo de Servicios de Protección Social a Menores* de 2006[55]. Por lo cual, es menester referirnos a las diferentes etapas en las que se atiende un referido de maltrato; así como el ofrecimiento de servicios a la familia, conforme a la mencionada normativa.

El Modelo de Seguridad va dirigido a controlar el peligro o amenaza de daño al menor y establecer un Plan de Acción Protectora o un Plan de Seguridad a los fines de lograr la seguridad, permanencia y bienestar de los menores. Este modelo se adopta con el propósito de guiar al personal de servicio directivo y de supervisión en el análisis crítico y secuencial para la toma de decisiones sobre la seguridad de un menor. Establece como objetivo general evaluar la seguridad de todos los menores referidos como parte del proceso de investigación de maltrato y durante la vida del

---

[52] *Íd.*, pág. 26.

[53] *Íd.*

[54] Depto. de la Familia, *Manual de Normas, Procedimientos y Estándares de Ejecución sobre el Modelo de Seguridad en la Investigación de Referidos de Maltrato de Menores (septiembre 2008)*, ADFAN-PS-PFF-CSA-2008-011 [en adelante, "*Modelo de Seguridad*"].

[55] Depto. de la Familia, *Manual de Normas y Procedimientos de Continuo de Servicios de Protección Social a Menores (octubre 2006)*, ADFAN-PFF-CSA-2006-021 [en adelante, "*Manual de Continuo de Servicios*"].

caso. Además, establece como objetivos específicos estandarizar los procedimientos para la evaluación de seguridad comenzando con el recibo del referido en la Línea Directa para Situaciones de Maltrato hasta concluir la investigación del referido; proveer una estructura para la toma de decisiones que garantice la seguridad de los menores; y uniformar el proceso de investigación de referidos[56]. De manera que se establece un procedimiento uniforme con una serie de etapas en la investigación y atención de los referidos[57]. Estas normas y procedimientos aplican tanto a las investigaciones de referidos de familias sin antecedentes en el Servicio de Protección a Menores y a la investigación de referidos de casos activos[58].

Por su parte, el Manual del Continuo de Servicios establece las normas y procedimientos que debe seguir el personal de dirección, supervisión y servicio directo en el desarrollo de los servicios que se ofrecerán al menor y su familia como un continuo, dependiendo de la etapa de intervención y unidad de trabajo correspondiente. Estos servicios tienen el propósito de lograr la seguridad y bienestar del menor y evitar riesgos de sufrir maltrato, maltrato institucional, negligencia o negligencia institucional. También incluye los servicios que se ofrecen al padre, madre o las personas responsables del menor con el fin de fomentar modificaciones en los patrones de crianza. A su vez, estos servicios consisten en acciones, actividades y gestiones que llevan a cabo los miembros de la familia y el Trabajador Social (TS) o el Técnico de Servicios a la Familia (TSF) y que responden a un plan estructurado y enmarcado en tiempo, ofrecidos mediante estrategias de investigación, consejería, albergue, atención médica y presentación de acciones legales, entre otras[59].

---

[56] *Modelo de Seguridad, supra*, Sección 101.
[57] *Íd.*, Sección 102.
[58] *Íd.*, Sección 103.
[59] *Modelo de Continuo de Servicios, supra*, Sección 100.

Expongamos las disposiciones de los referidos manuales aplicables a los hechos que motivaron la presente apelación.

Modelo de Seguridad

**Sección 103.1 Procedimiento para el Recibo del Referido en la Línea Directa o en la Oficina Local:**

**Sección 103.1.1 Etapa del Recibo del Referido:**

. . . .

**A. El/La Telecomunicador/a o Trabajador/a de Casos ("Intaker") en la Oficina Local:**

1. Todas las llamadas que se reciban en la Línea Directa o en la Oficina Local se cernirán.

2. Permitirá que el informante ofrezca la información que motivo su llamada.

3. Luego, comenzará la entrevista, como tal. Enfocará sus preguntas para obtener información que ayude a cernir el referido.

. . . .

4. El/la Supervisar/a documentará su decisión utilizando el sistema mecanizado, de estar disponible, o documentando su decisión en el Formulario ADFAN-SFN-PSM-003, "Cernimiento de Referido de Ma1trato/Negligencia", septiembre 2008.

5. Luego, deberá dirigir sus preguntas para obtener información que ayude a determinar si en la situación referida, existen señales de Peligro Presente.

6. Finalmente, el/la Telecomunicador/a o Trabajador/a de Casos ("lntaker"), enfocará sus preguntas con el informante para también recopilar, en la medida que sea posible, información sobre las seis (6) áreas de funcionamiento familiar.

. . . .

7. La calidad, suficiencia y pertinencia de la información que recoja el/la Telecomunicador/a o Trabajador/a de Casos ("Intaker") en la entrevista con el informante, determinará la precisión con la cual el/la Supervisor/a de la Línea Directa u Oficina Local, asignará la prioridad de respuesta al referido.

8. Todo referido que se reciba en la oficina local será informado a la Línea Directa.

- Si el referido es un caso activo, el "lntaker" pasará el mismo al Supervisor. Este determinará la prioridad de respuesta al referido y lo asignará al TS/TSF asignado al caso para su investigación. El "Intaker" informará a la Línea el referido y el tiempo de respuesta asignado por el/la Supervisor/a de la oficina local, en un periodo no mayor de dos horas, a partir de la fecha y hora del recibo del referido.

- Si el referido es de una familia sin antecedentes en el Servicio de Protección a Menores, el/la "Intaker" lo informará, inmediatamente a la Línea Directa. El Supervisor de la Línea será quien asigne la prioridad de respuesta al referido.

**C. El/La Supervisor/a de la Línea directa u Oficina Local:**

1. Evaluará la información recopilada por el/la Telecomunicador/a o Trabajador/a de Casos ("Intaker"), en un periodo no mayor de dos horas, a partir del recibo del referido, y asegurará de que:

- El referido cumple con los criterios establecidos para aceptarlo en la clasificación de protección a menores.
- Se obtuvo información suficiente parta determinar, (a nivel del referido), si existen o no indicadores de peligrosidad (presente o inminente) que amenacen la seguridad del/la menor.

2. El/la Supervisor/a de la Línea Directa asignará la prioridad de respuesta a los referidos que no tienen antecedentes a la Agencia. El/la Supervisor/a de la Oficina Local asignará la prioridad de respuesta al referido de caso activo. Utilizarán el sistema mecanizado, de estar disponible, o documentarán su decisión en el Formulario ADFAN-SFN-INV-001 – "Evaluación del Contenido del Referido para la Asignación de Prioridad de Respuesta" rev.2006/07; rev. septiembre 2008.

3. <u>Proceso para Determinar la Prioridad de Respuesta a un Referido</u>. La evaluación del referido, para la determinación de la prioridad de respuesta a asignarse, se hará de manera secuencial:

a. Se revisará cualquier otra información disponible, tales como los antecedentes de la familia.

b. Se aplicará la descripción de la prioridad de respuesta a Peligro Presente a la información recopilada del informante.

c. Para seleccionar la respuesta de Peligro Presente, deberán estar presentes todos los indicadores que describen esta prioridad de respuesta.

d. Del/la Supervisor/a decidir que la información recopilada del informante sugiere la presencia de Peligro Presente, entonces, aplicará la descripción de los criterios estandarizados de Peligro Presente. De esta manera, establecerá cuáles son las amenazas específicas qua se sugieren a nivel del referido y que deberán ser objeto de la preparación que hace el/la Investigador/a o Trabajador/a de Casos en le etapa del pre-contacto y que deberán ser atendidas por éste/a en el contacto inicial.

e. Del/la Supervisor/a decidir que la información recopilada por el informante no

sugiere la presencia de Peligro Presente, descartará esta Prioridad de respuesta, y proseguirá a evaluar la presencia de Peligro Inminente y, así sucesivamente.

A continuación, se elabora la descripción de cada una de las Prioridades de Respuesta:

- **Respuesta a Peligro Presente:**

    . . . .

    El/la Investigador/a o Trabajador/a de Casos, deberá hacer contacto cara a cara con la alegada víctima menor de edad y/o el padre, madre o persona responsable de inmediato, a partir de la fecha y hora del recibo del referido.

    . . . .

    4. Enviará el referido al Centro de Intervención del Programa de Emergencias Sociales (PES):

    - o los referidos de una familia sin antecedentes en el Servicio de Protección a Menores
    - o los referidos de maltrato institucional o de casos activos que se reciban fuera del horario regular de trabajo y que se clasifiquen en prioridad de "Respuesta a Peligros Presente" y en prioridad de "Respuesta a Peligro Inminente".

    5. Enviará a las Unidades de Maltrato Institucional todos los referidos que se reciban dentro del horario regular de trabajo.

    6. Enviará a las unidades de manejo de casos a la oficina local todos los referidos de caso activo que se reciban durante el horario regular de trabajo.

**Sección 103.2 Procedimiento para la Investigación de Referidos**

Toda investigación de referidos de maltrato de menores tiene tres objetivos medulares:

- Evaluar la seguridad del menor/a
- Tomar de inmediato las acciones protectoras que sean necesarias
- Determinar la disposición del referido

Tanto el/la Investigador/a como el/la Supervisor/a, deberán asegurar, justo antes de concluir la investigación, que se haya cumplido con los tres objetivos. Los referidos de casos activos serán investigados en la oficina local, excepto que los mismos sean recibidos fuera del horario regular de trabajo y el tiempo de respuesta asignada sea "Respuesta a Peligro Presente" o "Respuesta a Peligro Inminente". En esta situación, PES completará la evaluación de Peligro Presente y el Plan de Acción Protectora, del/la menor no estar seguro/a.

**Sección 103.2.1 Etapa de Pre-Contacto a Nivel de PES o de la Oficina Local:**

La prioridad asignada al referido, determinará el tiempo disponible para el siguiente procedimiento:

**A. El/la Supervisor/a del Centro de Intervención (PES) o de la Oficina local:**

1. <u>El/la Supervisor/a del Centro de intervención (PES)</u>, evaluará cada referido, tan pronto los reciba en el Centro . . . .

2. <u>El/la Supervisor/a de la oficina local</u>, evaluará cada referido de caso activo, tan pronto lo reciba en la oficina local. Se asegurará que, desde sus inicios, la intervención de la Agencia, en un referido de protección a menores, esté cumpliendo con las normas, procedimientos y estándares establecidos.

3. El/la Supervisor/a del Centro de Intervención (PES) y el de la oficina local, asignarán el referido de acuerdo a la prioridad asignada.

- Utilizarán el Formulario ADFAN-SFN-lNV-002- "Resumen para la Asignación de Referidos en el Servicio de Protección a Menores- rev. 2006/07, rev. julio 2008, rev. septiembre 2008. Esta tarea se llevará a cabo de forma electrónica, del sistema mecanizado proveer para ello.

4. Cuando se Identifiquen múltiples referidos con prioridad de Respuesta a Peligro Presente, o prioridad de Respuesta a Peligro Inminente que no se puedan atender de forma simultánea con los recursos disponibles en el momento, el/la Supervisor/a hará una excepción al orden de respuesta, a base de los siguientes criterios:

- Acceso del/a agresor/a y de otras personas;
- Si es posible establecer un plan para mantener la seguridad del/la menor hasta que la agencia pueda responder;
- Lugar donde se encuentra el/la menor, y
- Tiempo que el/la menor lleva en el lugar.

5. Documentará en el expediente la justificación de esa decisión;

6. Discutirá el referido con el/la TS/TSF asignado/a, siempre que sea posible. Como mínimo, documentará sus observaciones y sus recomendaciones en el Formulario ADFAN-SFN-LNV-002- "Resumen de la Situación para la Asignación de Referidos Utilizando el Modelo de Seguridad"- julio 2008, rev. septiembre 2008, (manual o a través del sistema mecanizado).

**B. El/la Investigador/a del Centro de Intervención (PES) o el/la Trabajador/a de Casos en la Investigación de Referidos de Caso Activo:**

. . . .

3. Se reunirá con el/la Supervisor/a y considerarán:

- El contenido del referido que describe los hechos alegados e información relacionada, con especial atención a las condiciones, conductas y situaciones familiares que significan que el/la menor está en Peligro Presente o Peligro inminente;

. . . .

**Sección 103.2.2 Etapa del Contacto Inicial con la Familia a Nivel de PES o de la Oficina Local: La Evaluación del Peligro Presente:**

. . . .

### 4. El Plan de Acción Protectora:

o Si existe Peligro Presente, el/la Investigador/a o Trabajador/a de Casos:
o Suspenderá la recopilación e información.
o Establecerá de inmediato un Plan de Acción Protectora ejecutando las acciones necesarias para eliminar o controlar el Peligro Presente. La acción protectora es una intervención con un propósito especifico; controlar los factores que ocasionan el peligro a la familia, por el plazo de tiempo que sea necesario, para completar el avalúo inicial y afianzar la seguridad del/la menor hasta que se obtenga una mayor comprensión de la familia.
o Por regla general, los planes de Acción Afirmativa se formulan como parte del contacto inicial con la familia. En algunas ocasiones se hace necesario realizar la acción protectora en el transcurso del avalúo inicial y en otras la acción protectora se establece mientras la Agencia brinda servicios, como resultado de un evento repentino del Peligro Presente. La acción protectora tiene que consistir de la acción inmediata que la situación requiera para controlar el Peligro Presente mientras se recopila más información
o Las medidas en el Plan de Acción Protectora tienen que ser:
   ❖ **INMEDIATAS**: requiere que la acción protectora entre en función el mismo día en que se establece. Antes de que el/la Investigador/a o Trabajador/a de Casos salga del hogar, el plan de acción inicial de acción protectora tiene que estar funcionando y confirmado.
   ❖ **A CORTO PLAZO**: . . . Las acciones protectoras no continuarán más allá del avalúo inicial, es decir, más allá de la etapa do la investigación del referido . . . .
   ❖ **SUFICIENTES**: . . . La confirmación de la suficiencia de una acción protectora inicial se realiza cuando el/la Supervisor/a aprueba la acción y firma el Plan de Acción Protectora. . . . .

### 7. Monitoreo del Plan de Acción Protectora o del Plan de Seguridad:

La seguridad del/la menor en el recurso de colocación deberá ser monitoreada al día siguiente de la colocación y, subsiguientemente, no menos de una vez a la semana.

El/la Investigador/a o Trabajador/a de Casos, monitoreará el cumplimiento del Plan de Acción Protectora o del Plan de Seguridad por las personas responsables de las acciones protectoras especificadas en el mismo, hasta tanto el expediente sea recibido en la oficina local.

### 8. Otras Acciones:

### a. Documentación del Expediente:

El/la Investigador/a o Trabajador/a de Casos, deberá documentar su Intervención en el contacto inicial, dentro de

las 24 horas a partir de la identificación del Peligro Presente y la creación de la acción protectora.

. . . .

**Sección 103.2.4 Etapa de Conclusión del Avalúo y de la Investigación:**

. . . .

**4. Margen de Tiempo para Completar la Investigación**

- El/la Investigador/a o Trabajador/a de Casos, completará la investigación o avalúo inicial en 30 días calendario a partir del recibo del referido en la Línea Directa. Se podrá extender el periodo por 30 días adicionales, mediante consulta y aprobación escrita por el/la Supervisor/a.
- El/la Supervisor/a deberá documentar en el expediente la/s razón/es para extender el periodo de investigación. De haberse implantado un Plan de Acción Protectora, y de ser necesario, se podrá extender el Plan a la fecha hasta la cual se extendió la investigación, pero no más allá de ese término de tiempo.

. . . .

**7. Revisión y Visto Bueno de Investigación**

- El/la Supervisor/a local dará su visto bueno y firmará solo aquellos expedientes donde se haya cumplido con el Protocolo de Entrevistas y con la suficiencia de información en las seis preguntas para la evaluación del Peligro Inminente.

Manual de Continuo de Servicios

**705.1 ETAPA DE COMPROMISO:**

**705.1(a) Pre-Contacto:**

**El pre-contacto implica que el(la) TS/TSF a quien se le asignó el caso, no ha tenido ningún contacto cara a cara con la familia y el(la) menor.**

**Tareas del Supervisor**

(a) A partir del recibo del expediente, el(la) Supervisor(a) hará lectura del mismo, haciendo un análisis de los hallazgos en las seis áreas de avalúo.

(b) Revisará si tiene un Plan de Acción Protectora o Un Plan de Seguridad para Garantizar que no sea interrumpida la monitoria del mismo.

. . . .

(d) Si el/la menor fue colocado en cuidado sustituto:

. . . .

- o Seleccionará al TS/TSF que atenderá la situación y llevará a cabo una reunión con el mismo, en preparación para el contacto con la familia.
- o Documentará en el expediente sus gestiones y le hará entrega del mismo al(la) TS/TSF.

**704.3(b) Personas a Entrevistar:**

. . . .

**Consultas del(la) Investigador(a) al(la) Supervisor(a):**

- El proceso debe ser de responsabilidad compartida entre el(la) investigador(a) y supervisor(a). Una vez obtenida la información suficiente que implique o sugiera maltrato, la misma debe ser compartida y discutida con el(la) Supervisor(a).
- El(la) Investigador(a) debe haber completado todo el procedimiento de investigación, de modo que posea suficientes elementos de juicio para tomar decisiones, con el apoyo del personal de supervisión.
- El(la) Supervisor(a) discutirá los hallazgos de la investigación y los aspectos relacionados a análisis de la seguridad del(los) menor(es) y evaluará el plan de seguridad, si aplica.

**El(la) Supervisor(a):**

- Proveerá apoyo y guía durante el contacto inicial y el avalúo.
. . . .
- Se asegura que la investigación cumple con los estándares y requerimientos del Programa y la Agencia.
- Asegurará que el historial refleje que se realizaron los esfuerzos para obtener la información.
. . . .
- Revisará, endosará la acción tomada o disposición del referido.
- Revisará, firmará y garantizará el envío del formulario FN-81 al Registro Central, cuando haya concluido la investigación.
- Estará atento a que se le haya interpretado los resultados de la investigación y el derecho de apelar la determinación tomada al padre, madre o persona responsable del(los) menor(es).

### III.

En síntesis, el DF sostiene que presentó prueba clara, robusta y convincente para demostrar que la señora Flores, en su posición de supervisora, se apartó de los modelos y manuales dispuestos por la agencia para atender los referidos sobre maltrato a la menor Y.M.I.V. De tal manera, arguye el DF, que la CASP abusó de su discreción al determinar que la señora Flores no cometió varias de las faltas imputadas y erró al sustituir la medida disciplinaria de destitución por una reprimenda escrita. Consecuentemente, el recurrente estima que un análisis basado en la totalidad del expediente (es decir, basado en todas las faltas halladas por la investigación del DF) demuestra que la destitución era la medida

disciplinaria proporcional a las faltas cometidas por la recurrida. En la alternativa, sostiene que las faltas reconocidas por el foro recurrido eran suficientes para sustentar la destitución.

En cambio, la recurrida sostiene que las faltas admitidas por la propia señora Flores y halladas por la Oficial Examinadora de la CASP no son de tal gravedad que ameriten la destitución como medida disciplinaria ante una primera ofensa. Por lo cual, entiende que la CASP no erró en su determinación.

Examinados los escritos de las partes, la prueba documental y la TPO, adelantamos que la CASP no erró al sustituir la medida disciplinaria de destitución por una reprimenda escrita. Veamos.

Comenzaremos por señalar que las faltas están desglosadas en la primera parte de esta Sentencia, por lo cual, se hace innecesario reiterarlas, de tal manera, nos limitaremos a copiarlas en las notas al calce.

Falta #1[60]:

La CASP determinó que la señora Flores no cometió la falta señalada[61], pues no falló en evaluar el contenido de los referidos de abuso de menores y establecer su prioridad de respuesta, toda vez que: (1) en cuanto al primer referido, al no tratarse de un caso activo, la prioridad de respuesta debió haber sido determinada por el Supervisor de Línea, este, a su vez, debió referirlo a PES para que se evaluara el contenido del referido y corroborara la prioridad de respuesta asignada, según el Modelo de Seguridad[62], así, se violentó el proceso estatuido: no le correspondía a la señora Flores evaluar el contenido ni asignar prioridad de respuesta al primer referido; y (2) sobre el segundo referido, al recibirse fuera del horario regular

---

[60] La Supervisora Flores falló al no evaluar el contenido de los referidos R11-11-48223 y el R11-12-48729, una vez los recibió en la Oficina Local, ni determinó la prioridad de respuesta según las amenazas de peligrosidad establecidas en las alegaciones de los referidos.

[61] Apéndice, págs. 351-55.

[62] Modelo de Seguridad, *supra*, Sección 103.1.1(C).

de trabajo, no debía ser evaluado y asignado prioridad de respuesta por la señora Flores, sino por PES, conforme al Modelo de Seguridad[63].

En respuesta, el recurrente sostiene, en cuanto al primer referido, lo siguiente:

> El hecho de que, reglamentariamente, no le correspondiera a la Oficina Local llevar a cabo el procedimiento, no era motivo para la señora Flores Álvarez omitir llevarlo a cabo según dispone el Modelo de Seguridad y el Manual de Continuo de Servicios, los cuales conocía. Una vez el supervisor regional le dio la orden de que la Oficina Local atendiera la investigación del referido, esta debió hacer lo propio para garantizar un manejo adecuado y una intervención inmediata de la agencia[64].

No le asiste la razón al recurrente, pues no consta en autos que el Supervisor Regional tenga la autoridad para soslayar a conveniencia los protocolos enunciados en las normas del DF por falta de personal o cualquier otra razón. De tal manera, la señora Flores no tenía el deber protocolar de evaluar el contenido del referido y asignar una prioridad de respuesta. Este Tribunal concede deferencia a la CASP en cuanto a la Falta #1.

Falta #2[65]:

La CASP determinó que la señora Flores no cometió la falta señalada[66], por la razón de que no falló al utilizar los formularios correspondientes para el primer referido, ni de asignarle una prioridad de respuesta en el sistema SIRCSe al primer referido y, además, sí discutió con la TS De Jesús la asignación de los referidos. En cambio, el segundo referido se recibió en la Línea de Maltrato

---

[63] *Íd.*

[64] *Recurso de Revisión Administrativa*, pág. 29.

[65] La Supervisora Flores falló en la Etapa de Pre-contacto en la investigación de los referidos R11-11-48223 y R11-12-48729:

    a. No utilizó el formulario "Resumen para la Asignación de Referidos en el Servicio de Protección a Menores, ADFAN-SFN-NV-002" al momento de asignar los referidos R11-11-48223 y R11-12-48729 a la TS De Jesús. Tampoco registró en el sistema SIRCSe la prioridad de respuesta determinada para la atención de estos referidos, ni sus recomendaciones para la investigación correspondiente.

    b. No se evidencia que la Supervisora discutiera la asignación de los referidos R11-11-48223 y R11-12-48729 a la TS De Jesús, así como las recomendaciones para la atención de estos.

[66] Apéndice, págs. 355-58.

fuera de horas laborables y a quien correspondía utilizar los formularios y asignar la prioridad de respuesta era a PES, conforme al Modelo de Seguridad.

Sobre si la señora Flores utilizó o no los formularios correspondientes para el primer referido, existen versiones encontradas por los testimonios de la señora Díaz Rodríguez y la señora Flores en la vista pública, sin embargo, la Oficial Examinadora otorgó mayor peso al testimonio de la señora Flores de que había completado dicho formulario, basándose en que la investigación de la señora Díaz Rodríguez fue insuficiente para corroborar el hecho de que no se había completado el formulario. Por otro lado, la señora Díaz Rodríguez aceptó que la señora Flores asignó el referido en el sistema SIRCSe y determinó como prioridad de respuesta que era "emergencia" (lo cual no se configura como una prioridad de respuesta según el Modelo de Seguridad), por lo cual, razonó la Oficial Examinadora que:

> **[E]l hecho de que la [Sra. Flores] no evidenciara que asignó la prioridad de respuesta a través del formulario . . . no es sinónimo de que la [Sra. Flores] no asignó la prioridad de respuesta y que no hubo una acción afirmativa por parte de la [Sra. Flores] y la TS De Jesús ante las alegaciones de maltrato contenidas en el primer referido**. La [Sra. Flores] discutió el referido con la TS De Jesús y le impartió la directriz, ante las alegaciones de maltrato físico del primer referido, de que visitara inmediatamente a la familia, en la dirección provista en el referido y esta así lo hizo[67].

Así, el argumento del recurrente en su recurso de que "para todo efecto práctico, la recurrida no asignó la prioridad de respuesta correcta"[68], no es procedente. Es verdad que la asignación de prioridad de respuesta no era técnicamente correcta, pero, aun así, hubo una acción afirmativa inmediata en respuesta al referido. La señora Flores se reunió con la TS De Jesús y discutió el primer referido con esta. Lo asignó a esta en el sistema SIRCSe, apenas

---

[67] *Íd.* pág. 356 (énfasis suplido).
[68] *Recurso de Revisión Administrativa*, pág. 31.

hora y media después de que se recibió en la Oficina Local y le impartió la directriz de que acudiera de inmediato a visitar a la familia en la dirección indicada en el referido para que tuviera el primer contacto cara a cara, conforme a las alegaciones contenidas en el referido y acorde con la prioridad de respuesta de peligro presente. Incluso, surge del propio testimonio de la testigo de la recurrente, la señora Díaz Rodríguez, que la TS De Jesús "salió a investigar ese mismo día a las cinco y media de la tarde"[69]. A tono con ello, este Tribunal defiere al juicio de la CASP en cuanto a la Falta #2.

Falta #3[70]:

La CASP determinó que la señora Flores no cometió la falta señalada[71], puesto que, en cuanto al primer referido, la señora Flores lo asignó el mismo día en que se recibió en la Oficina Local, apenas hora y media de su recibo en respuesta al peligro presente y, en cuanto al segundo referido, la Oficial Examinadora estima que la falta no se cometió, dado que surge de la prueba desfilada en la vista pública que la menor Y.M.I.V. se encontraba recibiendo tratamiento médico en el Centro Médico y la TS Torres del Centro Médico le había informado a la señora Flores que la situación era estable.

Aquí, no hay más que añadir respecto al primer referido, pero debemos evaluar la determinación del segundo referido, por tratarse de una precisión cuestionable. Al respecto, el recurrente alega que la señora Flores sostuvo que la dilación fue debido a que la menor Y.M.I.V. se encontraba segura en el hospital, sin embargo, el fundamento de la dilación era injustificado, ya que la madre tenía acceso a dicha menor y las alegaciones indicaban que ésta tenía

---

[69] TPO, Vista de 23 de mayo de 2022, pág. 45.
[70] La Supervisora Flores falló al no asegurar que la TS De Jesús cumpliera con la prioridad de respuesta que los referidos ameritaban.
[71] Apéndice, págs. 358-62.

"una fractura en la pierna derecha, que no era compatible con la versión ofrecida por la madre"[72]. Por lo cual, debió haber asegurado el contacto cara a cara lo más pronto posible.

Para comprender la gravedad de la dilación en atender el referido, nos remitimos al testimonio vertido por la testigo Díaz Rodríguez en la vista pública en su fondo cuando expresa lo siguiente:

> [S]e reportó [el segundo] referido el 1 de diciembre, no hubo una intervención del Departamento de la Familia hasta el 7 de diciembre del 2011. No obstante, el 6 de diciembre la trabajadora social del hospital del Centro Médico, la señora Torres se comunica con la supervisora Giselle Flores para traerle asuntos relacionado al caso . . . y le señala que la menor . . . **estaba ingresada en el hospital por fractura y que** . . . **sugería maltrato**. Ella exploró en términos de si esos hallazgos físicos de la menor podían ser, verdad, por una enfermedad de huesos de cristal y le señaló que en ese momento dado según la consulta que habían realizado al ortopeda no se clasificaba, verdad, por una enfermedad porque los huesos eran unos huesos fuertes[73].

Ante esta situación, la CASP razonó que, conforme al Modelo de Seguridad, cuando surgen múltiples referidos con prioridad de respuesta a peligro presente o peligro inminente que no se puedan atender de forma simultánea con los recursos disponibles en el momento, el Supervisor hará una excepción al orden de respuesta, a base de criterios tales como el acceso del agresor, lugar donde se encuentra el menor y tiempo que lleva en el lugar, entre otros[74]. De tal manera, afirma la CASP que, en este caso, dada la particularidad de que existía un primer referido desde hacía solo dos días y estaba bajo investigación, la señora Flores podía exceptuar el orden de respuesta, ya que se cumplían algunos de los criterios señalados[75]. No obstante, los autos del expediente administrativo y la prueba vertida en la vista en su fondo sugieren lo contrario: los criterios para hacer una excepción eran inexistentes, las señales de maltrato fueron informadas por los funcionarios médicos y su alegada

---

[72] *Recurso de Revisión Administrativa*, págs. 33-34.
[73] TPO, Vista de 23 de mayo de 2022, pág. 65 (énfasis suplido).
[74] Apéndice, pág. 361.
[75] *Íd.*

perpetradora tenía acceso directo a la menor. Y.M.I.V. Más aún, el segundo referido se recibió el 1 de diciembre de 2011, pero el contacto con la familia no se comenzó hasta el 7 de diciembre; esta dilación excesiva no se justifica ante circunstancias apremiantes como las descritas.

Por lo cual, concluimos que, en cuanto al segundo referido, la señora Flores sí falló al no asegurar que la TS De Jesús cumpliera con la prioridad de respuesta que este referido ameritaba. De tal manera que, la determinación de la CASP en cuanto a este asunto no merece nuestra deferencia.

Falta #4[76]:

La CASP determinó que la señora Flores sí cometió la falta señalada[77], pues el proceso de investigación de los referidos no fue debidamente documentado. No hay razón para que este Tribunal dicte lo contrario. Al respecto, la Oficial Examinadora de CASP consignó lo siguiente:

> La [Sra. Flores] aceptó, tanto en la investigación administrativa, como en su testimonio en la vista pública que, aunque entiende que cumplió con la evaluación de prioridad de respuesta y que la TS cumplió con los procesos de investigación en los dos referidos, y se completó un plan de servicios a la familia, hubo unos formularios que estaban incompletos. Específicamente el Informe de Intervención con Referido de Maltrato/Negligencia a Menores, ADFAN-SFN-INV-006, y la notificación de la acción tomada a las partes, FN-81. Ambos documentos no fueron completados dentro del

---

[76] No se evidencia que la Supervisora Flores revisara y aprobara la investigación de los referidos correspondientes a la Sra. Anaís Vega Sepúlveda y su familia. Esta no garantizó que las investigaciones realizadas por la Trabajadora Social De Jesús cumplieran con los estándares y procedimientos establecidos en la agencia.

    a. No se evidencia que corroborara que la TS cumpliera con la Evaluación de Peligro Presente del primer y segundo referido.

    b. No revisó ni aprobó el "Informe de Intervención con Referidos de Maltrato Negligencia a Menores", ADFAN-SFN-INV-006 (evaluación de seguridad) en los dos referidos.

    c. No aseguró que en la investigación del primer y segundo referido, trabajados por la TS De Jesús, la recopilación de información cumpliera con los estándares de suficiencia y pertinencia en las seis áreas de avalúo familiar. Tampoco revisó las decisiones tomadas por la TS respecto a la seguridad de la menor.

    d. No se evidencia notificación de acción tomada con el primer y segundo referido.

    e. No se aseguró que la TS De Jesús cumpliera con el término de tiempo establecido de 30 días calendarios, a partir del recibo del referido, para completar la investigación del primer y segundo referido. De acuerdo al sistema SIRCSe, la FN-81 del primer referido fue completada el 21 de diciembre de 2012 con fundamento. El segundo referido, se encuentra bajo investigación, pero se creó otra FN-81 de cese de servicios.

[77] Apéndice, pág. 363-64.

término establecido para ello. De manera que a base de la investigación efectuada por el [Departamento de la Familia] en el manejo del primer y el segundo referido la [Sra. Flores] no se aseguró de revisar y aprobar la investigación de estos al no completar los formularios provistos para ello, conforme al Modelo de Seguridad y el Manual del Continuo de Servicios. Tampoco se aseguró que se notificara la acción tomada en el primer y el segundo referido[78].

Falta #5[79]:

En resumidas cuentas, la CASP determinó que la señora Flores sí cometió la falta señalada por las mismas razones señaladas en la Falta #4[80].

Falta #6[81]:

La CASP determinó que, fuera de no haber completado el formulario aludido (Resumen de la Situación para la Asignación de Casos de Protección Social a Menores, ADFAN-SFN-PSM-004), la señora Flores no cometió la falta señalada[82]. Razona la CASP que el hecho de que la recurrida incumpliera con el formulario no es sinónimo de incumplimiento con las tareas de supervisora en la etapa de compromiso. Este Tribunal concede deferencia al aludido hallazgo de la CASP. Sobre ello, señala la Oficial Examinadora que:

> Sobre este señalamiento es preciso recordar que en el primer referido al no contar con un caso activo no le correspondía a la Oficina Local investigar el mismo. Ante este escenario es comprensible que, ante las directrices impartidas a la [Sra. Flores] por el supervisor regional de investigar un caso que no contaba con antecedentes en la Oficina Local, la [Sra. Flores] asignara la investigación del referido a la TS De Jesús que era la TS que estaba disponible y esta continuara con el manejo del caso. A esto se le añade el problema de escasez de personal que confrontaba la Oficina Local de Ponce II, lo cual incidió en este proceso. En cuanto al segundo referido, recibido fuera de horas laborables, este surge de manera simultánea al primer

---

[78] *Íd.*

[79] Según documentación del expediente, no se evidencia a qué fecha la Supervisora Giselle Flores activó el caso de la Sra. Anaís Vega Sepúlveda, bajo el referido inicial R11-11-48223, del 28 de noviembre de 2011. Tampoco se evidencia a qué fecha se determinó acciones con el referido R11-12-48729, del 1 de diciembre de 2011.

[80] Apéndice, pág. 364.

[81] Giselle Flores no cumplió con las tareas de supervisora en la Etapa de Compromiso. Ésta no asignó el caso de la Sra. Anaís Vega Sepúlveda a la Trabajadora Social Jésica de Jesús Laracuente o algún trabajador social. En el expediente social no se evidencia el formulario Resumen de la Situación para la Asignación de Casos de Protección Social a Menores, ADFAN-SFN-PSM-004, donde establezca las recomendaciones y tareas a ser realizadas por el manejador de caso.

[82] Apéndice, págs. 364-65.

referido y los dos se trabajaron en conjunto. De manera que la [Sra. Flores] sí asignó los referidos a la TS De Jesús.[83]

Falta #7[84]:

En resumidas cuentas, la Oficial Examinadora de la CASP determinó que la señora Flores cometió solo la falta ya señalada sobre que no se aseguró de documentar adecuadamente la investigación ni el manejo de los referidos, cosa que la recurrida aceptó en la vista pública[85]. No obstante, la Oficial Examinadora entendió que el Plan de Acción Protectora sí estaba en línea con el procedimiento establecido según la situación familiar presentada al momento de su elaboración. Este Tribunal acepta el juicio de la CASP respecto a la falta señalada.

Por otro lado, la Oficial Examinadora determinó que la señora Flores no garantizó que la TS De Jesús cumpliera con el monitoreo de los acuerdos con la familia, así como la evaluación de la seguridad de las menores, ya que no se hizo el monitoreo conforme a la frecuencia establecida en el Modelo de Seguridad, el cual exige un monitoreo de, al menos, una vez a la semana y aquí la TS De Jesús realizó tres visitas en el transcurso aproximado de dos meses. Este razonamiento encuentra fundamento en el expediente administrativo.

---

[83] *Íd.*

[84] La Supervisora Flores falló al avalar y endosar la intervención de la TS De Jesús desde la etapa de investigación, durante la etapa del manejo del caso hasta llegar al cierre del mismo, según se ha detallado en este informe.
   a. La supervisora falló al endosar un Plan de Acción Protectora que no estaba alineado con el procedimiento establecido, ni con la situación familiar presentada al momento de su elaboración.
   b. La TS De Jesús no completó la Evaluación de Peligro Presente del segundo referido.
   c. Se extendió el Plan de Acción Protectora el 10 de enero de 2012 hasta el 10 de febrero de 2012. De este último no se evidencia revisión y aprobación de la Supervisora Flores.
   d. La Supervisora Flores no garantizó que la TS De Jesús cumpliera con el monitoreo de los acuerdos con la familia, así como la evaluación de la seguridad de las menores.
   e. A pesar de que la TS De Jesús completó la notificación de cierre de caso, no se evidencia que la Supervisora Flores evaluara y discutiera esa determinación.
   f. Luego de un mes de la TS De Jesús haber cerrado el caso, surgió el incidente de maltrato reportado a la Línea el 1 de noviembre de 2012, el cual culminó en la muerte de la menor Y.I.V. de un año.

[85] Apéndice, págs. 365-369.

Por todo lo cual, concluimos que este foro adjudicativo concede las faltas halladas por la CASP, salvo la discrepancia señalada en cuanto al manejo del segundo referido con relación a la Falta #3, la cual entendemos se cometió.

Es nuestro deber conceder deferencia a las decisiones que tomen las agencias administrativas siempre que estas no actúen arbitraria, ilegal o irrazonablemente. Dada nuestra apreciación de las determinaciones de la CASP, es forzoso concluir que la señora Flores incumplió únicamente con el deber esencial estipulado por la Sección 6.6(7) de la Ley Núm. 184-2004 de "Realizar eficientemente y con diligencia las tareas y funciones asignadas a su puesto y otras compatibles con éstas que se le asignen"[86]. No obstante, la prueba no demuestra el que haya incumplido con el deber de observar conducta incorrecta o lesiva al buen nombre de la agencia o el Gobierno.

Terminado el análisis de la determinación de hechos de la agencia a la luz del estándar de revisión administrativa de nuestro ordenamiento jurídico, debemos pasar juicio sobre si la medida disciplinaria de la reprimenda escrita es proporcional a las faltas halladas. Este análisis es, a lo mínimo, una cuestión mixta de hecho y de derecho; debido a lo cual, nuestra revisión será plenaria.

Aquí, el recurrente nos señala que la CASP actuó irrazonablemente al sustituir la medida disciplinaria de destitución por la de reprimenda escrita. La cuestión última sobre si la agencia actuó irrazonablemente gira en torno a la interrogante de si las faltas cometidas por la señora Flores fueron suficientes para sustentar la destitución. Lo anterior se traduce en determinar si las faltas de la señora Flores fueron la causa de que la intervención del DF no fuera

---

[86] 3 LPRA sec. 1462e.

lo suficientemente adecuada para evitar la muerte de la menor Y.M.I.V.

Como expusimos anteriormente, nuestra jurisprudencia ha dilucidado un principio de proporcionalidad aplicable a la imposición de medidas disciplinarias a empleados públicos, el cual exige que las medidas guarden proporción a la falta cometida[87]. Como tal, "la destitución de un empleado o empleada del servicio público es un castigo extremo, que solo procederá ante conducta y actuaciones de eminente gravedad"[88]. Consecuentemente, como regla general, la destitución no procede ante una primera ofensa, salvo la falta sea tan grave que sea imprudente esperar su reiteración para sancionar la destitución[89].

A tenor con la doctrina jurisprudencial, el Manual de Acciones Administrativas, aplicable a los empleados del DF, reitera el principio de proporcionalidad mencionado y establece un orden sucesivo de medidas disciplinarias para ciertas ofensas[90]. Ante la guía general de medidas disciplinarias que establece el Manual de Acciones Administrativas, solo procederá por excepción, la imposición de medidas más severas cuando la gravedad de la falta lo amerite[91].

Cónsono con lo anterior, la guía general que ofrece la tabla del Manual de Acciones Administrativas **no** recomienda la destitución para ninguna de las faltas imputadas a la señora Flores, a saber, pertinentes al caso de marras, son las faltas #3 y #5 según aparecen en la tabla: "Conducta impropia dentro o fuera del trabajo de tal naturaleza que afecte el buen nombre o refleje descredito o ponga en dificultad a la agencia, cualquier otra agencia o dependencia del

---

[87] *Cruz Rivera v. Mun. de Guaynabo, supra*, pág. 611; *Torres Solano v. PRTC, supra*, pág. 515.
[88] *Rodrigo v. Tribunal Superior, supra*, pág. 168.
[89] *Srio. del Trabajo v. ITT, supra*, pág. 547.
[90] *Manual de Acciones Administrativas, supra*, Art. VIII, Sección 8.2.
[91] *Íd.*

gobierno" y "Realizar trabajo en forma negligente que afecte el buen nombre o refleje descredito o ponga en dificultad a la agencia, cualquier otra agencia o dependencia del gobierno", respectivamente[92]. En la tabla se recomienda la reprimenda o la suspensión como medida disciplinaria para una primera ofensa y se deja la destitución para una segunda o tercera ofensa[93].

Ante este marco normativo, es forzoso razonar que el fundamento de base que sirve al recurrente para justificar la destitución como medida disciplinaria proporcional a las faltas de la señora Flores, es que estas son de una gravedad tal que es imprudente esperar su reiteración para sancionar la destitución. Por lo cual, el único fundamento posible dentro del caso de marras que sostiene el "castigo extremo" de la destitución es *la suposición de que de haberse evitado las faltas imputadas a la Sra. Flores muy probablemente se hubiese evitado la lamentable tragedia de la pérdida de la vida de Y.M.I.V.* Sin embargo, colegimos que dicho argumento no encuentra apoyo en el expediente. Así pues, no existe razón para desviarse de la regla general establecida en el Manual de Acciones Administrativas.

En síntesis, del expediente surge que las faltas imputadas a la señora Flores no impidieron que el caso fuera manejado hasta su cierre, aunque se probaran varios defectos en el manejo de este. Podemos observar que, durante el tiempo en que el caso estuvo activo, la señora Vega asistió y completó exitosamente los talleres de la Escuela para la Vida en Familia del Módulo Psicoeducativo para el Fortalecimiento Familiar. Posteriormente, ante información sobre el comportamiento asocial de la señora Vega, se le requirió que acudiera a la Clínica Conductual APS y fuera evaluada por la psicóloga Jéssica Serrano, quien concluyó que al momento no

---

[92] *Íd.*, pág. 26.
[93] *Íd.*

presentaba indicadores de depresión, ni condición que requiriera tratamiento psicológico o psiquiátrico en la clínica. Asimismo, antes del cierre del caso, la menor Y.M.I.V. acudió a sus citas médicas para ser evaluada, sin que se reportara algún indicador de maltrato.

Como puede apreciarse, la familia Irizarry-Vega cursó el trayecto dispuesto por el DF para este tipo de caso hasta que finalmente se cerró. La tragedia ocurrió luego del cierre del caso y se relaciona a un tercer referido en el cual la señora Flores no tuvo participación en sus funciones de supervisora.

Independientemente de las faltas imputadas a la señora Flores, pecaríamos de especulación infundada si sostuviéramos que las faltas imputadas constituyen la causa suficiente para la tragedia que luego sobrevino. Aquí, lo razonable es imputar a la señora Flores ciertas faltas relacionadas con los protocolos sobre manejo de caso vigentes al momento de los hechos como concluyó la CASP. No obstante, es irrazonable imputar a la señora Flores la muerte de una menor a manos de su madre cuando esta última había cumplido con un plan de servicios y su caso había culminado. En fin, entendemos que las faltas de la señora Flores denotan cierto descuido en sus funciones que la sujetan a medidas disciplinarias, pero la destitución no es proporcional a los hallazgos de incumplimiento, máxime, cuando se trata de una primera ofensa.

Además, añadimos que, el Manual de Acciones Administrativas expresa que, al proceder a determinar una acción disciplinaria contra un empleado, deberán considerarse una serie de factores, entre los cuales se indican: años de servicio, productividad, su expediente personal e historial de servicios, las reincidencias, la naturaleza de la falta que comete, combinación de infracciones en que incurra el empleado y la posición jerárquica

dentro de la organización con relación a la infracción cometida[94]. Es de notar que el propio *Informe Investigación Administrativa* de 5 de diciembre de 2013, preparado por la investigadora del DF, manifestó tomar como atenuante a la hora de imponer la medida disciplinaria contra la señora Flores el hecho de la falta de personal en la Oficina Local de Ponce II durante el periodo de tiempo entre el recibo del primer referido y la susodicha tragedia[95]. Según los datos que fundamentan la investigación, al momento de los hechos había solo tres (3) empleadas, incluyendo a la señora Flores, quien atendía los casos referidos y las emergencias que surgieran en la región de la Oficina Local. Este atenuante pesa como un factor importante para determinar la medida disciplinaria, puesto que es indicativo, no de una empleada deficiente en sus funciones, sino de una agencia desgobernada.

Al fin y al cabo, no ha quedado establecido mediante prueba clara, robusta y convincente la existencia de un nexo causal entre el descuido de la señora Flores en el manejo del caso de la señora Vega y el asesinato de la menor. a manos de su madre lo suficiente como para ameritar una destitución. Es decir, el recurrente no ha logrado rebatir la presunción de corrección y legalidad de la cual gozan las agencias administrativas, ya que no ha demostrado con evidencia sustancial la falta de justificación de la decisión de la CASP. Por las mismas razones, determinamos que la recurrente no logra establecer la proporcionalidad entre las faltas imputadas y halladas y la medida disciplinaria de destitución.

Por estas razones, entendemos que la CASP no abusó de su discreción ni fue irrazonable al sustituir la medida disciplinaria impuesta por el DF sobre la señora Flores de destitución por la

---

[94] *Íd.*, Art. VIII, Sección 8.2 (énfasis suplido).
[95] Apéndice, pág. 475.

reprimenda escrita, pues basó su decisión en la evidencia que consta en el expediente administrativo.

**IV.**

Por los fundamentos antes expuestos, **confirmamos** la *Resolución* recurrida.

Notifíquese.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones